[No. S114778. Aug. 29, 2005.]

COUNTY OF SAN DIEGO, Cross-complainant and Appellant, v.
ACE PROPERTY & CASUALTY INSURANCE COMPANY et al.,
Cross-defendants and Respondents,

408

**COUNSEL**

John J. Sansone, County Counsel, William A. Johnson, Jr., and William L. Pettingill, Deputy County Counsel; Massie, Berman & Millerick, LaSala & Millerick, Michael F. Millerick; Latham & Watkins, David L. Mulliken and Christine G. Rolph for Cross-complainant and Appellant.

Anderson Kill & Olick, Alex D. Hardiman, William G. Passannante; Law Offices of Amy Bach and Amy Bach for United Policyholders as Amicus Curiae on behalf of Cross-complainant and Appellant.

Zevnik Horton and David S. Cox for ITT Industries, Inc., and Rayonier, Inc., as Amici Curiae on behalf of Cross-complainant and Appellant.

Daley & Heft and Margaret A. Hendrick for California State Association of Counties as Amicus Curiae on behalf of Cross-complainant and Appellant.

Stanzler Funderburk & Castellon, Jordan S. Stanzler and William W. Funderburk, Jr., for California Cast Metals Association as Amicus Curiae on behalf of Cross-complainant and Appellant.

Crowell & Moring, Jonathan H. Pittman, Mark D. Plevin; Chapin Shea McNitt & Carter, Edward D. Chapin, Maria C. Roberts, Shirley A. Gauvin; Berman & Aiwasian and Deborah A. Aiwasian for Cross-defendants and Respondents.

Wiley Rein & Fielding, Laura A. Fogan, John C. Yang, Paul J. Haase; Sinnott, Dito, Moura & Puebla, Randolph P. Sinnott and John J. Moura for

Complex Insurance Claims Litigation Association as Amicus Curiae on behalf of Cross-defendants and Respondents.

Hancock Rothert & Bunshoft, Patrick A. Cathcart, William J. Baron and Kathryn C. Ashton for London Market Insurers as Amicus Curiae on behalf of Cross-defendants and Respondents.

## OPINION

**BAXTER, J.—**

### INTRODUCTION

In this matter we must determine whether a nonstandard "excess" third party liability policy issued by Ace Property & Casualty Insurance Company (Ace) to the County of San Diego (County) affords indemnity coverage for expenses incurred by the County in responding to an administrative agency order requiring it to remediate environmental contamination, and for sums expended by the County to settle related third party property damage claims outside the context of a lawsuit.

In *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945 [103 Cal.Rptr.2d 672, 16 P.3d 94] (*Powerine I*), we held that under the wording of the standard primary comprehensive general liability (CGL) policy, the term "damages" limits the insurer's indemnification obligation to "money ordered by a court," i.e., a money judgment entered against the insured in a third party suit for damages. (*Id.* at pp. 960, 964.) We went on to conclude that the duty to indemnify does not extend to the costs of complying with a governmental agency's environmental cleanup and abatement orders because such administratively imposed liabilities do not constitute "money ordered by a court." (*Id.* at p. 966.)

The central insuring provision in the policy at issue here likewise obligates Ace to indemnify the County for all sums the insured becomes obligated to pay by reason of liability imposed by law for "damages" resulting from the destruction or loss of use of tangible property. The trial court concluded that the term "damages" is controlling and limits the indemnification obligation in the policy to court-ordered money judgments in the same way this court concluded the term circumscribes the scope of coverage under the standard primary CGL policy examined in *Powerine I*. The Court of Appeal agreed

with the trial court's reasoning and affirmed its judgment. For reasons to follow, we agree with the lower courts' interpretation of the operative term "damages" in Ace's nonstandard policy. Accordingly, we shall affirm the judgment of the Court of Appeal.

We reach a contrary conclusion in another decision also filed today—*Powerine Oil Company, Inc. v. Superior Court* (2005) 37 Cal.4th 377 [33 Cal.Rptr.3d 562] (*Powerine II*)—because the literal insuring language of the excess/umbrella policies at issue in that case is materially different from the insuring language in the Ace excess policy and the standard primary CGL policy considered in *Powerine I*.

### FACTUAL AND PROCEDURAL BACKGROUND

The County as cross-complainant appealed from a judgment entered against it after the trial court granted the summary adjudication and summary judgment motions of cross-defendant Ace.[1] The County contended that the trial court misinterpreted Ace's nonstandard excess third party liability policy as not providing coverage for the County's settlements of nonlitigated claims, including an administrative order to remediate groundwater contamination and third party property damage claims arising from the contamination. Specifically, the County asserted that the trial court erred by applying *Powerine I, supra,* 24 Cal.4th 945, in which this court held that the term "damages" in the insuring clause of the standard CGL policy is limited to "money ordered by a court." (*Id.* at pp. 960, 964.)

The Ace policy here in issue is commonly referred to in insurance industry parlance as a nonstandard or "manuscript form" policy. (See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2004) ¶ 3:38, p. 3-7.) It was in effect from 1974 through 1977. The policy requires Ace to indemnify the County "for all sums which the insured is obligated to pay by reason of liability imposed by law or assumed under contract or agreement," arising from "damages" caused by personal injuries or the destruction or loss of use of tangible property. Additional pertinent policy provisions are set forth and discussed in detail, *post.*

The following factual background was set forth in the opinion of the Court of Appeal. In 1969 the County began operating a solid waste facility known as the Ramona Landfill. The Ramona Landfill overlies potable groundwater, and in 1970 the Regional Water Quality Control Board (Regional Water Board) imposed operational requirements on the County.

---

[1] The named cross-defendants also included Ace's predecessor companies, Cigna Property & Casualty Company and Aetna Insurance Company.

In March 1997, the Regional Water Board issued a cleanup and abatement order to the County, requiring it to investigate, monitor and remediate groundwater contamination caused by the Ramona Landfill. The County waived a hearing before the board to challenge imposition of the remedial cleanup order.

In June 1997, the owners of property (the Sossamans) near the Ramona Landfill complained to the County that groundwater contamination would affect the property's marketability and their physical and mental health. The Sossamans requested that the County purchase their property without the necessity of litigation. The County believed it more likely than not that the Sossamans' property was contaminated. It had the property appraised "and preliminary negotiations including the preparation of necessary transfer documentation [were] initiated." The Atkinsons, also property owners near the Ramona Landfill, filed a similar claim in 1997.

In November 1997, the County settled the Sossamans' claims by paying them $318,000 for the acquisition of their property and relocation benefits. In December 1998, the County settled the Atkinsons' claims by paying them $259,500 for the acquisition of their property and relocation benefits.

In May 1997, the County began seeking indemnification from Ace for costs of complying with the remedial cleanup order. Ace reserved its right to deny coverage on numerous grounds, including the absence of any third party lawsuit. In September 1997, the County began seeking indemnification from Ace for the Sossaman and Atkinson claims. Regarding these claims, none of the correspondence between the County and Ace is included in the appellate record. Ace never indemnified the County for any of the settlements.

The County then filed a cross-complaint against Ace in a declaratory relief action brought against the County by another of its insurers, Pacific Indemnity Company.[2] The County's first amended cross-complaint included causes of action for declaratory relief, express indemnity, breach of contract and breach of the implied covenant of good faith and fair dealing. In the breach of contract cause of action, the County alleged Ace breached its duty to indemnify the County for losses it incurred in complying with the Regional Water Board's remedial cleanup order and in settling the Sossaman and Atkinson claims. In its cause of action for breach of the implied covenant of

---

[2] Pacific Indemnity Company obtained summary judgment in its favor and is not involved in this appeal.

good faith and fair dealing, the County alleged, among other things, that Ace failed to "attempt[] in good faith to effectuate a prompt, fair and equitable settlement of the County's claims for indemnification although liability had become reasonably clear" and failed "to pay indemnification benefits to the County pursuant to said claims."

In an affirmative defense to the cross-complaint, Ace alleged it had no duty to indemnify the County for costs incurred in complying with the remedial cleanup order or settling the Sossaman and Atkinson claims because the controlling term "damages" in the insuring clause of the policy limited coverage to money judgments imposed against the insured in a court of law. The County moved for summary adjudication on this affirmative defense. The trial court initially granted the County's motion, determining that the "language of the policy suggests a reasonable interpretation that the County need not suffer a judgment before [Ace's] duty to indemnify takes effect."

Ace moved for reconsideration of the ruling on the County's motion for summary adjudication, based on the decision in *Powerine I, supra,* 24 Cal.4th 945. On the same ground, Ace also moved for summary adjudication of its duty to indemnify the County for its costs and expenses of complying with the Regional Water Board's remedial cleanup order. On reconsideration, the trial court reversed its ruling and denied the County's motion for summary adjudication. The court then granted Ace's motion for summary adjudication of its duty to indemnify the County for the costs and expenses of complying with the remedial cleanup order. The court determined that despite the nonstandard nature of the Ace policy, under *Powerine I, supra,* 24 Cal.4th 945, Ace's duty of indemnity was limited to "damages" imposed in a court suit, i.e., "money ordered by a court." (*Id.* at pp. 960, 964.)

The County in turn moved for reconsideration of the trial court's order granting Ace's motion for summary adjudication. Ace countered with a motion for summary judgment on the question whether it had a duty to indemnify the County for the costs of the Sossaman and Atkinson settlements. The trial court denied the County's motion for reconsideration and granted Ace's summary judgment motion, explaining "[t]here is no duty to indemnify [the] County for the so-called 'private property expenses' (purchase and moving expenses) because they were not 'money ordered by a court.' " Judgment was entered for Ace in July 2001.

The Court of Appeal affirmed the trial court's judgment, determining that the motions for summary adjudication and summary judgment were properly granted in the insurer's favor. The court held that under this court's decision

in *Powerine I, supra,* 24 Cal.4th 945, the term "damages" in the insuring provisions of Ace's policy limits the duty to indemnify to money judgments ordered by a court, and that although certain other policy terms make reference to the settlement of claims, the policy language read as a whole does not extend the indemnification obligation to the costs and expenses of out-of-court settlement of claims.

We granted the County's petition for review. Amicus curiae briefs in support of the County have been filed by the California State Association of Counties, United Policyholders, and the California Cast Metals Association. Amicus curiae briefs in support of Ace have been filed by the Complex Insurance Claims Litigation Association and the London Market Insurers.

DISCUSSION

### 1. *Standard of review and rules of insurance policy interpretation*

■ The issue before both the trial court and Court of Appeal was one of law: the interpretation of the indemnification obligation under the nonstandard policy language of the policy issued to the County by Ace. "When determining whether a particular policy provides a potential for coverage . . . , we are guided by the principle that interpretation of an insurance policy is a question of law. (*AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 818 [274 Cal.Rptr. 820, 799 P.2d 1253].)" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

As explained in *Powerine II, supra*, 37 Cal.4th at pages 390–391:

■ " 'The insurer is entitled to summary adjudication that no potential for indemnity exists . . . if the evidence establishes as a matter of law that there is no coverage. [Citation.] We apply a de novo standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy.' (*Smith Kandal Real Estate v. Continental Casualty Co.* (1998) 67 Cal.App.4th 406, 414 [79 Cal.Rptr.2d 52]; see *Powerine I, supra,* 24 Cal.4th at p. 972.)

■ "In reviewing de novo a superior court's summary adjudication order in a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts. We reiterated those rules in our decision in *Foster-Gardner[, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857 [77 Cal.Rptr.2d 107, 959 P.2d 265] (*Foster-Gardner*)]:

■ " ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545]; see *AIU* [*Ins. Co. v. Superior Court* (1990)] 51 Cal.3d [807] at pp. 821–822.) "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1264.) "Such intent is to be inferred, if possible, solely from the written provisions of the contract." (*AIU, supra,* 51 Cal.3d at p. 822.) "If contractual language is clear and explicit, it governs." (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1264.)' (*Foster-Gardner, supra,* 18 Cal.4th at p. 868.)

■ " ' "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." (*Waller v. Truck Ins. Exchange, Inc.*[*, supra,*] 11 Cal.4th [at p.] 18 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) The fact that a term is not defined in the policies does not make it ambiguous. (*Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co., supra,* 5 Cal.4th at p. 866; *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1264; *Castro* v. *Fireman's Fund American Life Ins. Co.* (1988) 206 Cal.App.3d 1114, 1120 [253 Cal.Rptr. 833].) Nor does "[d]isagreement concerning the meaning of a phrase," or ' "the fact that a word or phrase isolated from its context is susceptible of more than one meaning.' " (*Castro* v. *Fireman's Fund American Life Ins. Co., supra,* 206 Cal.App.3d at p. 1120.) " '[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1265, italics omitted.) "If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." (*La Jolla Beach & Tennis Club, Inc.* v. *Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37 [36 Cal.Rptr.2d 100, 884 P.2d 1048].)' (*Foster-Gardner, supra,* 18 Cal.4th at p. 868.)" (*Powerine II, supra,* 37 Cal.4th at pp. 390–391.)

2. *The Ace policy language and this court's decisions in* Foster-Gardner, Powerine I, *and* Powerine II

The County argued in the Court of Appeal that the trial court erred in determining, under this court's holding in *Powerine I, supra,* 24 Cal.4th 945,

that the term "damages" in the insuring agreement of the Ace policy limits indemnity coverage to court-ordered money judgments against the insured.[3]

■ As noted, in *Powerine I* we held that "the insurer's duty to indemnify the insured for 'all sums that the insured becomes legally obligated to pay as *damages*' under the standard [CGL] insurance policy is limited to money ordered by a court." (*Powerine I, supra,* 24 Cal.4th at p. 960, italics added.) We based this conclusion in part on what we termed "*Foster-Gardner's* syllogism." (*Ibid.*) Several years earlier, in *Foster-Gardner, supra,* 18 Cal.4th 857, this court held that the insurer's duty to defend the insured in a "suit seeking damages" under the wording of the same standard CGL policy is likewise limited to civil suits prosecuted in court. (*Id.* at pp. 878–888.) In the analysis that followed in *Powerine I,* we explained that the insurer's obligation to indemnify for "damages" is limited to "money ordered by a court," in part because the provisions in the standard CGL policy imposing both a duty to defend and a duty to indemnify on the insurer each "link[] 'damages' to a 'suit,' i.e., a civil action prosecuted in a court." (*Powerine I, supra,* 24 Cal.4th at p. 962.)

Here, however, the Ace nonstandard third party liability policy is an "excess" policy[4] providing the County as the insured with excess liability coverage over and above its "self-insurance program or a self-insured retention arrangement for any part of the underlying limits of liability." Ace's nonstandard excess policy does *not* contain a duty to defend suits. Accordingly, the *Foster-Gardner* syllogism is not directly implicated in this case.

However, the scope of the indemnification obligation under this policy remains governed by our holding in *Powerine I.* The central insuring language of the Ace policy obligates Ace to indemnify the County for "all sums which [the County] is obligated to pay by reason of liability imposed by law or assumed under contract or agreement" for "*damages* . . . by reason of injury of any nature sustained by any person or persons" and "*damages* because of injury to or destruction of tangible property." (Italics added.) The

---

[3] Alternatively, the County argued in the Court of Appeal that Ace's reservation of rights to deny coverage and certain other allegedly wrongful conduct allowed the County to protect its interests by settling the claims without Ace's consent and then obtain reimbursement for the settlements. This latter claim was rejected by the Court of Appeal as a matter of law, and the County did not seek review of that aspect of the court's holding.

[4] As a general matter, the term "excess coverage" refers to indemnity coverage that attaches upon the exhaustion of underlying insurance coverage for a claim. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 8:76, p. 8-39 [" 'Excess' means 'insurance that begins after a predetermined amount of underlying coverage is exhausted and that does not broaden the underlying coverage.' [Citations.]"].)

Court of Appeal below correctly concluded that the reasoning of our decision in *Powerine I* regarding the limitation the term "damages" imposes on the scope of indemnity coverage under the standard CGL policy applies perforce to the insuring provisions of this nonstandard excess insurance policy which, like the standard CGL policy considered in *Powerine I*, utilizes "damages" as the sole term of limitation of the indemnity obligation under the insuring agreement.

■   As we observed in *Powerine I*, "the duty to indemnify 'entails the payment of money' (*Aerojet-General Corp. v. Transport Indemnity Co.* [(1997)] 17 Cal.4th [38,] 56 [70 Cal.Rptr.2d 118, 948 P.2d 909]; accord, *Buss v. Superior Court* [(1997)] 16 Cal.4th [35,] 46 [65 Cal.Rptr.2d 366, 939 P.2d 766])," "has as its purpose 'to resolve liability . . . *after* liability is established' ([*Aerojet-General Corp. v. Transport Indemnity Co., supra,* 17 Cal.4th] at p. 56, italics added)," and "can arise only after damages are fixed in their amount (see *Aerojet-General Corp. v. Transport Indemnity Co., supra,* 17 Cal.4th at p. 56; *Buss v. Superior Court, supra,* 16 Cal.4th at p. 46)." (*Powerine I, supra,* 24 Cal.4th at p. 958, some italics omitted.)

We explained further in *Powerine I* why the term "damages" in the policy provision imposing the duty to indemnify, both in its legal and commonly understood or " 'ordinary and popular sense,' " is limited to "money ordered by a court" separate and apart from the deductive reasoning of *Foster-Gardner*'s syllogism. (*Powerine I, supra,* 24 Cal.4th at p. 969.) It is limited to money judgments in part because "within the legal and broader culture," " 'harm' exists traditionally outside of court [citations]," whereas " '[d]amages' exist traditionally inside of court. [Citations.]" (*Id.* at p. 962.) We observed that inclusion of the term "damages" in the insuring agreement of the standard CGL policy precluded a finding that a broad right to indemnification *outside the context of a lawsuit* was intended under the policy language: "[O]ne would *not* speak of any 'sum that the insured becomes legally obligated to pay *as damages*' apart from any order by a court. . . . That is because, as a sum that the insured becomes legally obligated to pay, 'damages' presuppose an institution for their ordering, traditionally a court, albeit no longer exclusively. [Citations.] 'Damages' do not constitute a redundancy to a 'sum that the insured becomes legally obligated to pay,' but a limitation thereof." (*Id.* at p. 963, fn. omitted.)

The County argues that the definition of "ultimate net loss" contained in the limits of liability provision of the Ace policy, when read together with the central insuring language, creates an independent basis for extending the

insurer's indemnification obligation under the policy beyond damages to the costs and expenses of responding to adminstratively issued environmental cleanup orders or settling related third party liability claims outside the context of a lawsuit.

The language on which the County relies is contained in the policy's "limits of liability" provision, which in turn makes reference to a definition of "ultimate net loss." The provision reads as follows:

"LIMITS OF LIABILITY: Liability under this policy shall attach to the company only after . . . the named insured [has] paid or [has] been liable to pay, the full amount of [its] respective *ultimate net loss* liabilities as follows:

"100,000 EACH OCCURRENCE

"250,000 ANNUAL AGGREGATE

"Personal Injury or Property Damage or Personal Injury and Property Damage combined

"[A]nd the company shall then be liable to pay only such additional amounts as will provide the insured with a total coverage under the policy . . . and/or whatever portion of coverage is self-insured by the named insured, and this policy combined of:

"$1,000,000.00 each occurrence combined single limit for Personal Injury or Property Damage . . . .

"It is hereby agreed that should the named insured utilize a self-insurance program or a self-insured retention arrangement for any part of the underlying limits of liability, then the named insured's salaried employees or their designee shall be used as adjusters on behalf of the named insured. It is further agreed that all legal matters concerning *claims* under this policy in excess of any self-insured portion of underlying coverage shall be coordinated through a firm or person mutually agreed upon." (Italics added.)

"Ultimate net loss" in turn is defined in the policy as "the sum or sums which the assured shall become legally obligated to pay in settlement or satisfaction of claims, suits or judgements . . . includ[ing] all expenses from the investigation, negotiation and settlement of claims . . . and shall include legal costs."

A similar argument was raised by the insured in *Powerine II, supra,* 37 Cal.4th 377. In that decision, we have concluded that the literal wording of the central insuring agreement and incorporated definition of "ultimate net loss" in nine excess/umbrella policies issued to the insured over the course of 10 years *did* unambiguously extend the indemnification obligation under those policies beyond "damages," i.e., a court-ordered money judgment against the insured, to the "expenses" or liability of administratively imposed environmental response costs outside the context of a court suit. (*Powerine II, supra,* 37 Cal.4th at p. 382.)

The Court of Appeal that authored the now superseded opinion in *Powerine II* agreed with the insured's reading of the indemnification obligation under the nine standard form excess/umbrella policies therein concerned. The Court of Appeal in this case had before it for consideration the published decision of the Court of Appeal in *Powerine II,* as review in that matter had not yet been granted as of the time the Court of Appeal filed its decision in this case. The Court of Appeal below expressly considered and *distinguished* the policy language at issue in *Powerine II* from the policy language at issue in this case.

There are several key distinctions between the central insuring provision and incorporated definition of "ultimate net loss" in the standard excess/umbrella policies at issue in *Powerine II,* and the central insuring provision and referenced definition of "ultimate net loss" found in this *nonstandard* third party liability policy.

First, the term "expenses" was expressly contained in the central insuring clause of the excess/umbrella policies at issue in *Powerine II*: " 'The Company hereby agrees . . . to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability . . . imposed upon the Insured by law . . . for damages, direct or consequential *and expenses, all as more fully defined by the term 'ultimate net loss'* on account of: . . . property damage . . . caused by or arising out of each occurrence [covered hereunder] . . . .' (Italics added.)" (*Powerine II, supra,* 37 Cal.4th at pp. 385–386, some italics omitted.) In contrast, the term "expenses" is *not* found in the central insuring provision of the Ace policy—the obligation to indemnify extends only to "all sums which the insured is obligated to pay by reason of liability imposed by law or assumed under contract or agreement" for "damages" resulting from personal injuries or the destruction or loss of use of tangible property.

■ Second, the central insuring provision of the standard excess/umbrella policies at issue in *Powerine II, supra,* 37 Cal.4th at pages 385–386, expressly

purports to " 'more fully define[]' " " 'damages, direct or consequential and expenses' " through incorporation of a definition of "ultimate net loss" into the insuring clause itself. (Italics omitted.) *In contrast, the definition of "ultimate net loss" here is neither incorporated into, referenced, nor a part of the central insuring clause of the Ace policy.* Instead, as explained, it is referenced in the "limits of liability" policy provision, the main function of which appears to be the setting forth of limits of *excess* liability coverage over the insured's "self-insurance program or a self-insured retention arrangement for any part of the underlying limits of liability." In that specific context, the definition of "ultimate net loss" merely serves to define the insured's total loss that will count toward such policy limits. "Insurance policies are written in two parts: an insuring agreement which defines the type of risks being covered, and exclusions, which remove coverage for certain risks which are initially within the insuring clause." (*Rosen v. Nations Title Ins. Co.* (1997) 56 Cal.App.4th 1489, 1497 [66 Cal.Rptr.2d 714].) Nothing in the "limits of liability" provision of the Ace policy purports to expand Ace's indemnification obligation, once triggered, to anything other than "damages."

These two distinctions were not lost on the Court of Appeal below, which, in the course of rejecting the County's argument for an expansive construction of indemnity coverage under the Ace policy, distinguished the policy language in *Powerine II* when observing, "In contrast to *Powerine II,* the Ace policy's insuring clause does not include the term 'expenses' to broaden the coverage beyond that provided by the word 'damages.' . . . Further, the insuring clause does not define the term 'damages' by reference to the 'ultimate net loss' provisions, in which the references to the settlement or satisfaction of *claims* appears."

Finally, the Ace policy contains a "no-action" provision. As the Court of Appeal below explained, "[T]he Ace policy provides that '[n]o action shall lie against the company unless, as a condition precedent thereto, . . . the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.' The Ace policy also provides that the County 'shall not, except at [its] own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the occurrence.' Conditions such as these ordinarily appear in policies including the duty to defend, and they are intended to invest the insurer with the right to control the defense and preclude collusion between the insured and the third party claimant. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7:439.6, p. 7A-116.) These conditions belie the notion that the

term *damages* in the Ace policy extends the indemnity duty to any settlement entered into by the County."

In *Powerine I, supra*, 24 Cal.4th 945, we briefly discussed the standard form CGL policy's "so-called no-action provision, which, in typical language, generally states that 'no action' by a third party 'shall lie' against the insurer unless the insured's 'obligation to pay shall have finally been determined' either by a 'judgment' against the insured 'obtained after an actual trial' or by a 'settlement' reduced to contract to which the insurer 'agrees.' " (*Id.* at p. 962, fn. 4, italics omitted.) We explained that the "no-action" clause implies that the insurer may owe a duty to indemnify, but in its further reference to a "judgment," "implies as well that [the] duty is limited to money ordered by a court." (*Ibid.*)

█ In sum, we agree with the Court of Appeal below that the insuring language of the standard CGL policy discussed in *Powerine I* and the insuring clause of the Ace nonstandard third party liability policy are substantively the same. The central insuring provision in the Ace policy, like the policy considered in *Powerine I*, contains only the "damages" limitation standing alone, makes no express reference to "expenses," and does not purport to further define the scope of indemnity coverage set forth in the insuring provision by reference to the definition of "ultimate net loss," as was the case with the nine excess/umbrella policies scrutinized in *Powerine II*. We conclude that costs and expenses associated with responding to administrative orders to clean up and abate soil or groundwater contamination *outside the context of a government-initiated lawsuit seeking such remedial relief,* and property buyout settlements negotiated with third party claimants outside the context of a court suit, do not fall within the literal and unambiguous coverage terms of the Ace policy's insuring agreement.

### 3. *Out-of-state authorities cited by the County*

In supplemental briefing, the County has relied on several recent out-of-state decisions purportedly supporting its contention that the term "damages" in the Ace policy should be construed more broadly than it was in *Powerine I*. We are unpersuaded.

The County first draws our attention to the Illinois Supreme Court's recent decision in *Central Illinois Light Co. v. Home Ins. Co.* (2004) 213 Ill.2d 141 [821 N.E.2d 206, 216–218, 290 Ill.Dec. 155] (*Central Illinois*). The plaintiff in *Central Illinois* brought a coverage action against its excess liability insurers for indemnification of funds expended to investigate and remediate

environmental coal tar contamination at several of its sites that formerly manufactured gas, creating coal tar as a by-product, in the era before natural gas pipelines became the predominant source of such fuel. (*Central Illinois, supra*, 821 N.E.2d at pp. 208–209.) The *Central Illinois* policies expressly excluded coverage for expenses. The Illinois Supreme Court nonetheless concluded the insured's costs incurred in investigating and remediating environmental contamination at its facilities were covered under the policies, not as "expenses," but as sums the insurer was legally obligated to pay "as damages."

The *Central Illinois* court based that conclusion in large part on its belief that it is "generally understood" in the insurance industry that "funds paid to resolve . . . claims" in the absence of a lawsuit constitute "damages," although the court offered no support whatsoever for this observation. (*Central Illinois, supra*, 821 N.E.2d at p. 218.) In contrast, in *Powerine I* this court provided an extensive and authoritative analysis of why the term "damages" has legally, commonly, and traditionally been understood to denote "money ordered by a court," which conclusion was supported by a wide range of sources drawn from both legal and nonlegal authorities.

The *Central Illinois* court discussed and distinguished this court's *Powerine I* decision on the ground that the primary CGL policies at issue in *Powerine I* contained a duty to defend, while the excess policies before it for interpretation did not. (*Central Illinois, supra*, 821 N.E.2d at pp. 215–216.) That distinction is of no consequence here, since Ace's policy likewise contains no duty to defend, and we are not relying on the presence of such a clause in the policy to conclude that the term "damages" limits indemnity to money ordered by a court.

Insofar as the policies at issue in *Central Illinois* expressly *excluded* coverage for "expenses," rather than conclude that the costs of complying with administrative cleanup orders are "expenses," the *Central Illinois* court concluded such costs fall within the meaning of "damages," and for that reason were covered under the policies there in issue. Indeed, in concluding that "damages" are not limited to money ordered by a court, the *Central Illinois* court placed heavy reliance on the decision of the Maryland Court of Appeals in *Bausch & Lomb v. Utica Mutual* (1993) 330 Md. 758 [625 A.2d 1021], noting, "We find *Bausch & Lomb* highly persuasive and not readily distinguishable on its facts." (*Central Illinois, supra*, 821 N.E.2d at p. 223.) In contrast, we expressly *rejected* the reasoning of *Bausch & Lomb* and other similar cases in *Powerine I*, concluding our research revealed that the term "damages" has legally and traditionally always been understood as limited to money ordered by a court. (*Powerine I, supra*, 24 Cal.4th at p. 965.)

*Central Illinois* is thus not availing to the County's position, particularly given the presence of a "no-action" clause in this policy, which reinforces our conclusion that the indemnification obligation set forth under the literal terms of the policy was intended to be limited to money judgments for damages against the insured.

Next, the County draws our attention to the South Carolina Supreme Court's recent decision in *Helena Chemical v. Allianz Underwriters Ins. Co.* (2004) 357 S.C. 631 [594 S.E.2d 455] (*Helena Chemical*). In the portion of the opinion cited by the County, the *Helena Chemical* court overturned the trial court's conclusion that sums expended to remediate soil contamination are not "damages" *because they are not paid as compensation for property damage to a third party.* This, in essence, is the same conclusion unanimously reached by this court over 14 years ago in *AIU Ins. Co. v. Superior Court, supra,* 51 Cal.3d at pages 821–822. Moreover, *Helena Chemical,* like *Central Illinois,* places considerable reliance on the Maryland Court of Appeals decision in *Bausch & Lomb v. Utica Mutual, supra,* 625 A.2d 1021, and as explained, *ante,* this court has already *expressly rejected* the reasoning of *Bausch & Lomb* and similar cases in *Powerine I.*

The court in *Helena Chemical* further concluded that the very fact that different courts across the nation have construed the term "damages" differently is " 'some indication of ambiguity.' " (*Helena Chemical, supra,* 594 S.E.2d at p. 459.) But " 'some indication of ambiguity' " is not the legal standard of review in California by which we determine whether the express terms of an insurance policy are ambiguous. (See, e.g., *California Casualty Ins. Co. v. Northland Ins. Co.* (1996) 48 Cal.App.4th 1682, 1694 [56 Cal.Rptr.2d 434]; *Castro v. Fireman's Fund American Life Ins. Co., supra,* 206 Cal.App.3d at p. 1120.) Our standard for declaring ambiguity in insurance policy language is a good deal more discriminating—language "capable of two or more constructions, both of which are reasonable" (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 18) is required before ambiguity will be declared and construed against the insurer in order to protect the insured's reasonable expectation of coverage. (*La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co., supra,* 9 Cal.4th at p. 37.) In *Powerine I, supra,* 24 Cal.4th at page 971, we expressly rejected the reasoning of out-of-state cases that have found the "damages" limitation in third party liability policies ambiguous under different standards. The term, having been judicially construed by this court, is not ambiguous. (*Bartlome v. State Farm Fire & Casualty Co.* (1989) 208 Cal.App.3d 1235, 1239 [256 Cal.Rptr. 719].)

Next, the County also draws our attention to the Vermont Supreme Court's recent decision in *Hardwick Recycling & Salvage, Inc. v. Acadia Insurance Company* (2004) 2004 VT 124 [869 A.2d 82]. That decision

appears to have little if anything to do with the case at bench. It involved a "claims made" third party liability policy, which is a *different* type of policy than the "occurrence based" policies at issue in *Powerine I, Powerine II*, and the instant case. The Acadia insurance policy in *Hardwick Recycling* covered damages arising from "pollution liability hazard" in the event a third party claim was made against the insured during the period the policy was in effect. The State of Vermont had issued a potentially responsible party letter (PRP) to Hardwick Recycling pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601 et seq.), *and thereafter formally brought suit against the insured five years later*. Overturning the trial court's summary judgment order in favor of the insurer, the Vermont Supreme Court concluded that the state's 1995 PRP letter constituted a claim for damages within the 1995 policy period, thereby triggering the insurer's *duty to defend* the state's lawsuit subsequently filed in the year 2000. In reaching this ruling, the Vermont high court stated that the term "damages" could reasonably be understood to include money the insured must pay out to remediate environmental pollution. (*Hardwick Recycling, supra,* 869 A.2d at p. 90.) Once again, that holding is functionally the same as this court's unanimous holding to that effect 14 years ago in *AIU*.

Finally, in a footnote in its supplemental brief, the County has cited the Connecticut Supreme Court's recent decision in *R.T. Vanderbilt Co. v. Continental Cas. Co.* (2005) 273 Conn. 448 [870 A.2d 1048]. Here again, as far as we can discern, the decision in *R.T. Vanderbilt* has little if anything to do with the interpretation of the duty to indemnify in a third party liability policy. The decision does hold that the issuance of a PRP letter to an insured in and of itself can trigger the *duty to defend* in primary CGL policies under Connecticut law because, as the *R.T. Vanderbilt* court concluded, the term "suits" in the "duty to defend" clause, in the opinion of that court and several other sister-state courts, is ambiguous. Of course, this court held just the opposite in *Foster-Gardner, supra,* 18 Cal.4th 857, in which we found nothing ambiguous about the standard duty to defend clause that limits the defense obligation to "suits for damages." In any event, as explained, since Ace's *nonstandard* excess third party liability policy issued to the County does not contain a duty to defend provision, our holding in *Foster-Gardner* is not directly implicated in this case.

### 4. *The County's claim of detrimental reliance*

Last, the County asserts that Ace's payment history under the policy in question establishes that the parties reasonably believed the policy provides the expanded indemnity coverage sought by the County. Indeed, the County, in its reply brief, suggests that Ace has "conceded" (in its answer brief) that it

paid the County's claims in the 1970's, including claims that the County presented to Ace after settlements were consummated. Thus, the County argues, "in the years directly after the issuance of the Ace Policy, Ace paid the County's claims after resolution, thereby confirming the County's reasonable expectations that 'claims' are covered."

We do not read Ace's briefs as containing the concession described by the County. To the contrary, Ace argued that "The parties' alleged course of dealing does not support the county's proposed interpretation of the policy." As Ace explained, a third party adjuster was retained to adjust liability claims *within the County's self-insured retention* during the three years that the Ace policy was in effect. During that time, the County submitted third party claim summaries, compiled by the adjuster and identifying sums the County had paid under its self-insurance program, to Ace. That is precisely what the express terms of this policy required. Under those terms, the independent adjuster was not establishing the value of claims for purposes of submission for payment by Ace. Rather, the adjuster was establishing the aggregate value of claims for purposes of allocating covered losses to the County's self-insured retention. Covered claims that must be paid up to a specified aggregate limit by the insured under its self-insured retention are not, by definition, subject to indemnification by the insurer.

Ace reports that it generally agreed with the valuation of the settlements of the claims as reported in the claim summaries. Third party claims paid by the County and reported to Ace for this purpose, we are told by Ace, involved routinely covered third party liability matters such as automobile accidents and false arrests. Ace has represented in its answer brief that "there is no evidence that the County ever reported payment of any costs associated with an administrative order or cleanup and abatement order . . . in these claim summaries, nor is there any evidence that [Ace] agreed to pay any such costs."

Apparently there was one instance in which the County asked for, and Ace agreed to reimburse the County for, amounts reflected in the claim summaries that were in excess of the County's annual self-insured retention requirement under the policy. We agree with Ace that, on such facts, at most, the record establishes that Ace willingly reimbursed the County for sums paid to settle such claims before judgment. That is plainly within the insurer's discretion, and it is entirely consistent with other policy provisions recognizing the insurer's discretionary right to approve and fund any out-of-court settlement of claims, e.g., the "no-action" clause.

CONCLUSION

The judgment of the Court of Appeal is affirmed, and the matter remanded to that court for further proceedings consistent with the views expressed herein.

George, C. J., and Chin, J., concurred.

**WERDEGAR, J.,** Concurring.—I concur in the judgment under the compulsion of *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945 [103 Cal.Rptr.2d 672, 16 P.3d 94] and *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857 [77 Cal.Rptr.2d 107, 959 P.2d 265], decisions from which I dissented and which in my view deserve reconsideration.

**MORENO, J.,** Concurring.—I concur in the judgment. We were not asked to grant review to decide whether *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945 (*Powerine I*) and *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, should be overruled, nor were these issues addressed by the parties. (Cf. *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 292 [250 Cal.Rptr. 116, 758 P.2d 58] [noting the arguments of counsel and amici curiae that our decision in *Royal Globe Ins. Co. v. Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329] should be reconsidered].) I therefore concur under compulsion of the principles set forth in those cases. I am uncertain, however, of the soundness of these two decisions. (See *Powerine I, supra,* 24 Cal.4th 945, 975 (dis. opn. of Kennard, J.); *Foster-Gardner, supra,* 18 Cal.4th 857, 888 (dis. opn. of Kennard, J.).)

**KENNARD, J.,** Concurring and Dissenting.—In my dissenting opinion in *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 975 [103 Cal.Rptr.2d 672, 16 P.3d 94], I explained why, in my view, the word "damages" in a standard comprehensive general liability insurance policy's indemnity provision does not refer only to judgments rendered in judicial proceedings but includes also the costs of complying with an administrative order to mitigate and remediate the effects of environmental pollution. Although the policies at issue here are excess/umbrella policies rather than comprehensive general liabilities policies, that difference is not material to the issue presented here. Therefore, unlike the plurality, I would not limit the word "damages" in the indemnity provisions of these policies to money ordered by a court. Instead, I would hold that it includes expenses that the County of San Diego incurred to comply with the Regional Water Quality Control Board's cleanup and abatement order.

I agree with the plurality, however, that the insurer was not obligated to indemnify the county for its costs of settling the claims of adjoining property owners, in the absence of the insurer's consent to the settlements, at least to the extent those costs were not mandated by any administrative order.

Appellant's petition for a rehearing was denied October 26, 2005. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.