**PROGENY VENTURES, INC.,**
a California corporation,
Plaintiff,

v.

**WESTERN UNION FINANCIAL SERVICES, INC., et al.,**
Defendants.

**Case No. CV 09–06741 DMG (VBKx).**

United States District Court,
C.D. California.

Nov. 16, 2010.

Robert M. Ross, Klass Helman & Ross, Encino, CA, for Plaintiff.

Colleen O'Brien, Steptoe & Johnson LLP, Los Angeles, CA, Douglas D. Janicik, Karl M. Tilleman, Steptoe & Johnson LLP, Phoenix, AZ, Lawrence P. Riff, Steptoe & Johnson LLP, Los Angeles, CA, for Defendants.

## ORDER RE DEFENDANT WESTERN UNION FINANCIAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT

DOLLY M. GEE, District Judge.

This matter is before the Court on Western Union Financial Services, Inc.'s ("Western Union" and "Defendant") Motion for Summary Judgment. The Court held a hearing on November 12, 2010. Having duly considered the respective positions of the parties, as presented in their briefs and at oral argument, the Court now renders its decision. For the reasons set forth below, Defendant's Motion is GRANTED.

## I.

### *PROCEDURAL HISTORY*

On June 16, 2009, Plaintiff filed a Complaint in the Los Angeles County Superior Court alleging the following causes of action: (1) breach of contract; (2) unjust enrichment; and (3) declaratory relief. On September 16, 2009, Defendant removed the action to this Court on the basis of diversity jurisdiction.

On April 13, 2010, the parties filed a stipulated request to dismiss Defendants Western Union Network (France) SAS ("WU France") and The Western Union Company ("WUC"). On May 3, 2010, the Court granted the parties' request and dismissed WU France and WUC as Defendants in this action. [Doc. # 34.]

On July 7, 2010, Defendant filed a Motion for Partial Summary Judgment.

Plaintiff filed an Opposition on October 21, 2010. Defendant filed a Reply on October 29, 2010.

## II.

### FACTUAL BACKGROUND

The facts material to the Court's decision are undisputed.

### A. *February 17, 1994 Letter Agreement*

On February 17, 1994, Progeny Ventures ("Progeny") and Western Union entered into a letter agreement ("1994 Letter Agreement") setting forth the terms and conditions under which Progeny could recruit banks for Western Union. (Def.'s Statement of Uncontroverted Facts ("Def.'s Facts") ¶ 5; Pl.'s Statement of Genuine Issues ("Pl.'s Issues") ¶ 5.) The 1994 Letter Agreement provides:

1. We expect you [Kofi Amoah] and Kwesi Yeboah to introduce us primarily to banks who are interested in becoming non-exclusive agents of our Western Union money transfer service. We are prepared to sign with such banks our standard agency agreement, provided they are deemed acceptable to us in terms of credit stature, image and business strategy. This will always be decided on a *case-by-case* basis and we can not give you any assurances that an actual agreement will be signed.

2. Each selected and approved bank is also meant to agree to sign a separate agreement with you and/or your company, Progeny Ventures, which will need Western Union's prior review and approval. This separate agreement will detail the compensation you will receive from a bank out of the bank's revenue share (which will be your sole compensation for your past and future services) and clarify the performance and respec-

tive compensation for any and all related activities such as:

- CSC [Customer Support Center] operations
- Settlement operations
- Local phone and communications
- International communications share (1/2)
- PC equipments
- Marketing
- Other

It is important that any split of revenue share between a bank and you be such that the bank be sufficiently protected to generate its own profits from this business. Otherwise, the bank may become disinterested in the conduct of this service.

(Declaration of Kofi Amoah ("Amoah Decl.") ¶ 1, Ex. 1; emphasis in original.)

### B. *February 13, 1995 Amendment*

The parties modified the 1994 Letter Agreement by a letter agreement dated February 13, 1995 (the "1995 Amendment"), which provides:

1. It is mutually agreed that Progeny Ventures will no longer attempt to recruit prospective agents for Western Union services, *except that Progeny may until August 16, 1995 complete negotiations with any of the banks that have been approached by Progeny prior to August 16, 1994, and are set forth in the attached list.* Western Union will consider entering into contracts with such banks (under the terms of the February 17, 1994 letter), if they are acceptable to Western Union and execute contracts satisfactory to Western Union on or before August 16, 1995.

\*     \*     \*

4. *Except as set forth in this letter,* neither Progeny nor Western Union *shall have any further obligation or lia-*

*bility to the other, including under the February 17, 1994 letter,* and both Progeny and Western Union hereby release the other from any and all claims or liabilities arising prior to the date of this letter. *Progeny agrees that after August 16, 1995, Western Union shall be free with no obligation or liability to Progeny to enter into agreements with any entity approached by Progeny including the banks set forth in the attached list.*

(Amoah Decl. ¶ 1, Ex. 4; emphasis added.)

First Bank of Nigeria ("FBN") is identified in the 1995 Amendment as a bank that Progeny had approached about becoming a Western Union agent. (Def.'s Facts ¶ 13; Pl.'s Issues ¶ 13.)

### C. *Defendant's Agreements with First Bank of Nigeria*

On August 15, 1995, Western Union entered into an agency agreement with FBN. (Def.'s Facts ¶ 14; Pl.'s Issues ¶ 14.) The 1995 Western Union–FBN agreement expired on December 31, 2002. (*Id.*) Effective January 1, 2003, Western Union and FBN entered into a new agreement. (Def.'s Facts ¶ 15; Pl.'s Issues ¶ 15.) The 2003 Western Union–FBN agreement expired December 31, 2007, or five years from January 1, 2003. (*Id.*) On April 17, 2008, Western Union Network (France) SAS and FBN entered into an agreement, by which FBN agreed to a 10% reduction in commissions from Western Union money transfers. (Def.'s Facts ¶¶ 16–17; Pl.'s Issues ¶ 16–17.)

### D. *Plaintiffs Agreements with First Bank of Nigeria*

On August 15, 1995, Progeny entered into an agreement with FBN, which continued contemporaneously with the 1995 Western Union—FBN agreement. (Def.'s Facts ¶¶ 18, 19; Pl.'s Issues ¶¶ 18, 19.) Effective March 1, 2003, FBN and Proge-

ny entered into a new commission-sharing agreement, which continued contemporaneously with the 2003 Western Union— FBN agency agreement. (Def.'s Facts ¶ 20; Pl.'s Issues ¶ 20.)

In 2008, FBN and Progeny attempted to negotiate a new commission sharing agreement. (Def.'s Facts ¶ 21; Pl.'s Issues ¶ 21.) FBN asked Progeny to accept 10% of net commissions because Western Union was paying FBN less in commissions under the 2008 Western Union—FBN agreement. (*Id.*) Progeny rejected FBN's proposal. (Amoah Decl. ¶ 18.) After the FBN–Progeny negotiations stalled, Progeny put Western Union on notice that FBN had not entered into the required commission-sharing agreement with Progeny and that Western Union was precluded from doing business with FBN as a result. (Amoah Decl. ¶ 15; Def.'s Facts ¶ 22; Pl.'s Issues ¶ 22.)

### III.

### *LEGAL STANDARD*

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *accord Mattos v. Agarano,* 590 F.3d 1082, 1085 (9th Cir. 2010). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party does not have the ultimate burden of

persuasion at trial, the moving party meets its burden of production and persuasion by either producing evidence negating an essential element of the nonmoving party's claim or defense or showing that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Id.* at 325, 106 S.Ct. 2548; *see also Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *see also Bias v. Moynihan,* 508 F.3d 1212, 1218 (9th Cir.2007). "[A]n opposing party may not rely merely on allegations or denials in its own pleading." Fed.R.Civ.P. 56(e).

"[T]he inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## IV.

### *DISCUSSION*

#### A. *Legal Standards Governing Contract Interpretation in California*

■ The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties, which is to be inferred, if possible solely from the written terms of the contract. *County of San Diego v. Ace Property & Casualty Ins. Co.,* 37 Cal.4th 406, 415, 33 Cal.Rptr.3d 583, 118 P.3d 607 (2005); *see also Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.,* 109 Cal.App.4th 944, 956, 135 Cal.Rptr.2d 505 (2003) (it is the objective intent, evidenced by the words of the contract, rather than the subjective intent of the parties that controls interpretation). If the contractual language is clear and explicit, such language governs. *County of San Diego,* 37 Cal.4th at 415, 33 Cal.Rptr.3d 583, 118 P.3d 607.

■ The words of a contract are to be understood in their ordinary and popular sense. Cal. Civ. Code § 1644; *see also Founding Members,* 109 Cal.App.4th at 955, 135 Cal.Rptr.2d 505. A contract provision is considered ambiguous when it is capable of two or more reasonable constructions, but such provisions must be construed in the context of the instrument as a whole and cannot be found to be ambiguous in the abstract. *County of San Diego,* 37 Cal.4th at 415, 33 Cal.Rptr.3d 583, 118 P.3d 607.

■ Where parties dispute the meaning of contractual language, the Court must first decide whether the disputed language is "reasonably susceptible" to the interpretation urged by the party. *Halicki Films, LLC v. Sanderson Sales and Marketing,* 547 F.3d 1213, 1223 (9th Cir.2008) (citing *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.,* 107 Cal.App.4th 516, 132 Cal. Rptr.2d 151 (2003)). "If it is not, the case is over." *Id.* In order to determine whether the disputed language is "reasonably susceptible" of a particular meaning, the Court must "provisionally receive" such evidence. *Halicki Films,* 547 F.3d at 1223 (citing *Morey v. Vannucci,* 64 Cal.App.4th 904, 912, 75 Cal.Rptr.2d 573 (1998), for the proposition that "it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face").

■ The test of admissibility of extrinsic evidence is as follows:

The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.

*Halicki Films,* 547 F.3d at 1223; *see also Founding Members,* 109 Cal.App.4th at 956, 135 Cal.Rptr.2d 505. Thus, only if, in light of the proffered extrinsic evidence, the Court determines the contractual language is susceptible to Plaintiff's interpretation is the Court required to then admit such evidence. *Halicki Films,* 547 F.3d at 1223.

### B. *Plaintiff's First Cause of Action for Breach of Contract Fails as a Matter of Law*

Defendant first contends that the 1995 Amendment bars Progeny's breach of contract claim. In particular, Defendant relies on the following provision in the 1995 Amendment:

> Progeny agrees that after August 16, 1995, Western Union shall be free with no obligation or liability to Progeny to enter into agreements with any entity approached by Progeny including the banks set forth in the attached list.

(Amoah Decl. ¶ 1, Ex. 4.)

Plaintiff, on the other hand, argues that the 1995 Amendment is ambiguous. According to Plaintiff, it was Progeny's understanding that "WU was free to enter into any agreement with any bank regarding its Money Transfer Service **except** for those banks brought to WU and accepted by then [sic] as agent banks before the 'cut-off' date of August 16, 1995, and as to *those* banks, WU was not 'free' of obligation but was expressly subject to the terms and conditions of the [1994 Letter Agreement]." (Pl.'s Opp'n at 6; emphasis in original.)

The parties do not dispute that the 1994 Letter Agreement was modified by the 1995 Amendment. The 1995 Amendment plainly provides that after August 16, 1995, Defendant "shall be free *with no obligation or liability*" to enter into agreements "with any entity approached by Progeny *including the banks set forth in the attached list.*" (Emphasis added.) The parties do not dispute that FBN is a bank that was included on the referenced list and that the agreement at issue is the April 17, 2008 agreement entered into by Western Union Network (France) SAS and FBN, well *after* the August 16, 1995 cutoff date.

▇ Nevertheless, in light of the parties' dispute regarding the meaning of the contractual language, the Court must consider Plaintiff's extrinsic evidence for the purpose of determining whether the 1994 Letter Agreement, as amended, is "reasonably susceptible" to Plaintiff's interpretation. Mr. Amoah, Progeny's Chief Operating Officer, states that under the terms of the 1994 Letter Agreement, it was agreed between the parties that if a bank did not enter into a Western Union approved collateral agreement with Progeny, Western Union could not do business with that bank. (Amoah Decl. ¶ 4.)

In support of its position, Plaintiff points to two letters: (1) a letter dated February 8, 1995 (the "February 8 Letter") from Arno D. Hausmann, on behalf of Western Union, to J.O. Sanusi, of FBN (Amoah Decl. ¶ 6, Ex. 2), and (2) a letter dated June 6, 1995 (the "June 6 Letter") from Raymond J. Paske, on behalf of Western Union, to B.O. Longe, of FBN (Amoah Decl. ¶ 8, Ex. 3). Plaintiff argues that the February 8 Letter "expressly states that any bank brought to Western Union by PVI and accepted by WU as an agent bank 'shall' enter into a commission sharing agreement with PVI" and points out that

the terms of the February 8 Letter were confirmed in the June 6 Letter.[1] (Pl.'s Opp'n at 2.)

■ Even if the February 8 and June 6 Letters are "reasonably susceptible" of Plaintiff's interpretation with respect to the 1994 Letter Agreement, Plaintiff nevertheless fails to demonstrate how they can be squared with the express terms of the 1995 Amendment. The 1995 Amendment specifically releases Defendant from its obligations and liability under the 1994 Letter Agreement "after August 16, 1995," including with respect to entities previously approached by Progeny. Although Plaintiff makes much of the fact that the 1995 Amendment was dated before the June 6 Letter, the 1995 Amendment by its terms contemplates that Western Union may enter into agreements with Progeny-introduced agent banks on or after August 16, 1995, well after the date of the June 6

Letter. The June 6 Letter therefore does not contradict the 1995 Amendment but is consistent with it as of the point in time when the Letter was written. Indeed, the 1995 Amendment's August 16, 1995 cutoff date comports with the express release language, which means precisely what it says—*i.e.,* "that *after* August 16, 1995, Western Union shall be free with no obligation or liability to Progeny to enter into agreements with any entity approached by Progeny including the banks set forth in the attached list."

On the evidence presented, even when viewing all inferences in the light most favorable to Plaintiff, the Court does not find that the 1995 Amendment is "reasonably susceptible" of Plaintiffs interpretation, *i.e.,* that Defendant is *forever* barred from entering into agency agreements with any bank introduced to Defendant by Progeny.[2] Plaintiff fails to establish that

---

1. The February 8 Letter provides:
   *Selected companies will enter into agreements with Progeny Ventures.* These agreements shall stipulate the responsibilities of Progeny Ventures and the sharing of revenues as stipulated in the agency agreements. It *shall be noted that the only compensation paid to Progeny Ventures shall be its share of the revenues.* All such agreements shall be reviewed and approved by Western Union and shall be conditioned on the signing of the agency agreement with Western Union.
   (Amoah Decl. ¶ 6, Ex. 2; emphasis added.)

2. At oral argument, Plaintiff's counsel emphasized the phrase "Except as set forth in this letter," found in section 4 of the 1995 Amendment to support his position that the terms of section 1 of the 1995 Amendment apply apparently in perpetuity to prohibit Western Union from entering into agency agreements with banks as to which Plaintiff had entered into commission-sharing agreements prior to August 16, 1995. Plaintiff's stance is that, because it completed a contract with FBN prior to the August 16 cut-off, FBN was in effect "grandfathered" as an entity that would always be subject to the 1994 Letter Agreement even if its pre-August 16, 1995 agree-

ment expired. While there certainly were ways in which the contract *could* have been written to express this concept, the one that the parties agreed to does not say this. Plaintiff's position is at odds with the language in both sections 1 and 4 which place a temporal scope upon those contracts potentially subject to the 1994 Letter Agreement. Section 1 requires Western Union only to "consider entering into contracts with such banks (under the terms of the February 17, 1994 letter), if they are acceptable to Western Union and execute contracts satisfactory to Western Union on or before August 16, 1995." Aside from the fact that the language gives Western Union the discretion to "consider" entering into contracts with such banks, the 1995 Amendment expressly relieves Western Union of any obligations as to contracts executed *after* the August 16, 1995 cutoff. After August 16, 1995, Section 4 of the 1995 Amendment permits Defendant to enter into agreements with entities identified on the list, including FBN, "with no obligation or liability to Progeny." This language sweeps within its coverage those situations, such as here, where pre-August 16, 1995 agreements between Plaintiff and a listed entity had expired. (Amoah Decl. ¶ 1, Ex. 4.)

Defendant breached its contract with Plaintiff.

■ Insofar as Plaintiff's breach of contract claim is also based on the implied covenant of good faith and fair dealing, Plaintiff's claim also fails. "[T]he scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Carma Developers, Inc. v. Marathon Development California, Inc.,* 2 Cal.4th 342, 373, 6 Cal. Rptr.2d 467, 826 P.2d 710 (1992). As Plaintiff identifies no terms in the 1994 Letter Agreement, as amended, that gives rise to an obligation that Defendant violated, Plaintiff also fails to establish that Defendant breached the implied covenant. *See, e.g., Berger v. Home Depot U.S.A., Inc.,* 476 F.Supp.2d 1174, 1177 (C.D.Cal. 2007) ("[T]he implied covenant will not apply where no express term exists on which to hinge an implied duty, and where there has been compliance with the contract's express terms").

The Court grants Defendant's Motion as to Plaintiff's first cause of action.

### C. *Plaintiff's Second and Third Causes of Action for Unjust Enrichment and Declaratory Relief Also Fail as a Matter of Law*

Defendant correctly points out that because the 1994 Letter Agreement, as amended, governs the parties' rights and obligations in this case, Plaintiff's claims for unjust enrichment and declaratory relief also fail.

■ California courts have held that there is no cause of action in California for unjust enrichment. *See, e.g., Durell v. Sharp Healthcare,* 183 Cal.App.4th 1350, 1370, 108 Cal.Rptr.3d 682 (2010). The phrase "unjust enrichment" does not describe a theory of recovery, but rather an effect: "the result of a failure to make restitution under circumstances where it is equitable to do so." *Lauriedale Assocs.,*

*Ltd. v. Wilson,* 7 Cal.App.4th 1439, 1448, 9 Cal.Rptr.2d 774 (1992), *cited with approval in Cruz v. PacifiCare Health Sys., Inc.,* 30 Cal.4th 303, 133 Cal.Rptr.2d 58, 66 P.3d 1157, 1168 (2003). Essentially, a common law claim for unjust enrichment is an action for restitution. *Cruz,* 30 Cal.4th at 320, 133 Cal.Rptr.2d 58, 66 P.3d 1157. "As a matter of law, an unjust enrichment claim does not lie where the parties have an enforceable express contract." *Durell,* 183 Cal.App.4th at 1370, 108 Cal.Rptr.3d 682.

■ In light of the Court's ruling that the 1994 Letter Agreement, as amended, is an enforceable express contract between the parties and that Plaintiff fails to establish any breach of that contract, the Court finds that Plaintiff's second cause of action for unjust enrichment fails as a matter of law.

Furthermore, inasmuch as declaratory relief is a remedy and not a cause of action, Plaintiff's third cause of action for declaratory relief survives only to the extent Plaintiff's claim for breach of contract warrants such relief. Given the failure of Plaintiff's breach of contract claim, it follows that Plaintiff also fails to establish a basis for declaratory relief.

The Court grants Defendant's Motion as to Plaintiffs second and third causes of action.

### V.

### *CONCLUSION*

In light of the foregoing,

1. Defendant's Motion for Summary Judgment is GRANTED;

2. All scheduled pretrial and trial dates are vacated; and

3. Defendant shall prepare and lodge a proposed Judgment within 10 days after the date of this Order.

IT IS SO ORDERED.