Filed 9/30/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MONTROSE CHEMICAL CORPORATION OF CALIFORNIA, | B335073 |
| Petitioner, | Los Angeles County Super. Ct. No. BC005158 |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| CANADIAN UNIVERSAL INSURANCE COMPANY, INC., et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS; petition for peremptory writ of mandate. Lawrence P. Riff, Judge. Petition denied.

Latham & Watkins, Brook B. Roberts, John M. Wilson, Drew T. Gardiner, Steven B. Lesan, Corey D. McGehee and Jessica L. England for Petitioner.

No appearance for Respondent.

O'Melveny & Myers, Richard B. Goetz, Zoheb P. Noorani and Jessica A. Snyder for Real Parties in Interest TIG Insurance Company and Federal Insurance Company.

———————————————

Would an objectively reasonable policyholder expect "sudden" to mean "gradual"? That is the dispositive issue presented in this case. More specifically, we must decide whether an insurance policy providing coverage for damage arising out of a "*sudden*" discharge, dispersal, release or escape of pollutants can reasonably be construed to provide coverage for damage arising out of a *gradual* discharge, dispersal, release or escape of pollutants. The trial court—believing it was bound by what the parties have labeled the "prior judicial construction" doctrine —concluded it had no discretion to receive extrinsic evidence to interpret the disputed policy language, because our state appellate courts have uniformly held that "sudden" unambiguously does not mean gradual.

Plaintiff Montrose Chemical Corporation of California petitioned this court for a writ of mandate to set aside the evidentiary ruling. At our Supreme Court's direction, we issued an order to show cause instructing the parties to address whether "the existence of a prior judicial construction of an insurance policy's form exclusion that found it to be unambiguous precludes a trial court from considering extrinsic evidence in determining whether the exclusion is ambiguous." As we will explain, the *general* answer to that question is "no," because a court may preliminarily consider all credible evidence offered to prove the intention of the parties to a contract, even if a disputed term appears to the court to be unambiguous on the face of the

2

instrument.  (See *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & R. Co.* (1968) 69 Cal.2d 33, 37, 39–40 (*Pacific Gas*); accord, *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391 (*Dore*); *Another Planet Entertainment, LLC v. Vigilant Ins. Co.* (2024) 15 Cal.5th 1106, 1144 (*Another Planet*).)  If the court decides the language of the contract is " 'fairly susceptible of either one of the two interpretations' " advanced by the parties, "extrinsic evidence relevant to prove either of such meanings is admissible." (*Pacific Gas,* at p. 40.)

In this case, however, the trial court correctly excluded the proffered extrinsic evidence.  We reach this conclusion not because past appellate panels have found the disputed policy language to be unambiguous in the abstract, but because these past authorities have uniformly rejected the *exact* interpretation advanced by Montrose—namely, that "sudden" could be reasonably construed to mean "gradual" in the relevant insurance policy provisions.  (See *ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1784–1794 (*ACL*); *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 754–755 (*Shell Oil*).)  Under these circumstances, adherence to the "judicial pecking order" compelled the trial court to follow this appellate precedent and exclude the proffered extrinsic evidence as irrelevant. (*Gwartz v. Superior Court* (1999) 71 Cal.App.4th 480, 481–482; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*).)

For our part, although we are not strictly bound by the decisions of courts exercising equal jurisdiction, we nonetheless reach the same conclusion as our colleagues in these past cases. While drafting history may be used as an aid to discern the

meaning of disputed language in a form insurance policy provision (see, e.g., *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647–654 (*MacKinnon*)), "as with any extrinsic evidence," it is "only relevant to the extent [it] tend[s] to prove a meaning of which the language of the policy is reasonably susceptible." (*Another Planet, supra,* 15 Cal.5th at pp. 1145–1146.) Whatever shades of meaning the word "sudden" may have, a *sudden* discharge, dispersal, release or escape of pollutants is not a *gradual* discharge, dispersal, release or escape of pollutants. "Gradual is the opposite of sudden." (*ACL, supra,* 17 Cal.App.4th at p. 1777.) We deny the writ.

## BACKGROUND

Montrose sued the defendant insurers (the Insurers or Real Parties in Interest) for a declaratory judgment establishing the company's right to coverage for environmental damage stemming from its operation of a DDT plant in Torrance. The Insurers each denied coverage under what the parties call a "qualified pollution exclusion" (QPE) appearing in each of the relevant comprehensive general liability (CGL) policies.

At the parties' suggestion, the trial court divided the case into five phases. Montrose's writ petition challenges the sole issue determined in Phase II-A: The interpretation of the QPEs.

The parties agreed to consolidate the different QPE iterations into nine categorical exemplars and stipulated that the trial court's interpretation of an exemplar would apply to all QPEs within the category. As relevant here, two categories —the Domestic QPE and the London QPE—contain the term "sudden."

The Domestic QPE excludes coverage for bodily injury or property damage "arising out of the discharge, dispersal, release

4

or escape" of pollutants, except that coverage is not excluded "if such discharge, dispersal, release or escape is *sudden and accidental*." (Italics added.) The London QPE similarly excludes coverage for injury or damage "caused by seepage, pollution or contamination," except that the exclusion "shall not apply . . . where such seepage, pollution or contamination is caused by a *sudden, unintended and unexpected* happening." (Italics added.)

During the Phase II-A pretrial proceedings, Montrose sought to introduce extrinsic evidence that it maintained was relevant to the QPEs' interpretation. This evidence included contemporaneous "drafting history" documents that accompanied the introduction of the "sudden" exception in the QPEs and statements made to several former state insurance commissioners by the insurance industry organization that promulgated the standard form language.

The Insurers objected to the evidence, principally arguing the trial court could not admit extrinsic evidence offered to advance an interpretation of the QPEs that contradicted their construction in binding California appellate authorities. In advance of ruling on the Insurers' objections, the trial court ordered Montrose to submit proposed findings that the insured sought to establish in the Phase II-A proceeding.

Montrose submitted that its proffered extrinsic evidence would demonstrate "the QPEs are reasonably susceptible to multiple interpretations (including Montrose's interpretation), and/or expose[ ] a latent ambiguity in the insurance policies." It urged that the "plain language of the policies" covers "unintentional and unexpected pollution, without regard to whether it is gradual or abrupt," and that the term "sudden," as used in the QPEs, "means 'unforeseen,' including

5

'unanticipated,' 'unplanned,' or 'unprepared for.' " As for ambiguity, Montrose maintained its proposed interpretation was "objectively reasonable," reiterating it would be "reasonable to interpret the QPEs as potentially covering pollution that is not 'expected or intended' by the policyholder, without regard to whether it is gradual or abrupt."

The trial court sustained the Insurers' objection, ruling that " 'a term having been judicially construed is not ambiguous and extrinsic evidence is inadmissible to interpret policy language that is unambiguous.' " (Italics omitted.) Because controlling appellate authorities had rejected Montrose's proposed interpretation, the court reasoned it "must follow 'the law declared by [these] courts of superior jurisdiction' " and exclude Montrose's proffered extrinsic evidence.

At Montrose's request, the trial court certified the following question of law for appellate resolution under Code of Civil Procedure section 166.1: " '[C]an a trial court admit extrinsic evidence to interpret insurance policy terms that have previously been judicially construed by a Court of Appeal, when such extrinsic evidence was not considered by the Court of Appeal in rendering its earlier decision?' "

Montrose filed a timely petition for writ of mandate to set aside the trial court's evidentiary ruling. At our Supreme Court's direction, we issued an order to show cause instructing the parties to address whether "the existence of a prior judicial construction of an insurance policy's form exclusion that found it to be unambiguous precludes a trial court from considering extrinsic evidence in determining whether the exclusion is ambiguous."

6

## DISCUSSION

1. ***Law Governing Interpretation of Insurance Contracts and Consideration of Extrinsic Evidence to Uncover a Latent Ambiguity***

" 'As a question of law, the interpretation of an insurance policy is reviewed de novo under well-settled rules of contract interpretation.' " (*Another Planet, supra,* 15 Cal.5th at p. 1135.) "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 (*Bank of the West*), citing *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 (*AIU*).) Thus, "the mutual intention of the parties at the time the contract is formed governs interpretation." (*AIU,* at p. 821.) "If possible, we infer this intent solely from the written provisions of the insurance policy." (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115, citing *AIU,* at p. 822.) "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' ([Civ. Code], § 1644), controls judicial interpretation. (*Id.*, § 1638.)" (*AIU,* at p. 822; accord, *Palmer*, at p. 1115; *Bank of the West,* at p. 1264; *Another Planet,* at p. 1136.)

" 'A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.' " (*Another Planet, supra,* 15 Cal.5th at p. 1136.) "[A] court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's *objectively reasonable expectations.* In so doing, the court must

interpret the language in context, with regard to its intended function in the policy.  [Citation.]  This is because '*language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*' "  (*Bank of the West, supra,* 2 Cal.4th at p. 1265, first italics added.)  "The fact that a term is not defined in the policies does not make it ambiguous. [Citations.]  Nor does '[d]isagreement concerning the meaning of a phrase,' or ' "the fact that a word or phrase isolated from its context is susceptible of more than one meaning." ' "  (*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 415 (*County of San Diego*).)  " 'Courts will not strain to create an ambiguity where none exists.' [Citation.]  'Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning.' "  (*Another Planet,* at p. 1136; see also *id.* at p. 1147, fn. 6; see *Baker v. National Interstate Ins. Co.* (2009) 180 Cal.App.4th 1319, 1327 ["If the language of the policy is not ambiguous, then the coverage inquiry ends, and the court determines coverage by applying the plain meaning of the unambiguous provisions of the policy."].)

However, " '[e]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.' "  (*Dore, supra,* 39 Cal.4th at p. 391.)  " 'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' "  (*Ibid.*, quoting *Pacific*

*Gas, supra,* 69 Cal.2d at p. 37.)  "When the language used in an agreement is fairly susceptible of two or more constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties." (*Nofziger v. Holman* (1964) 61 Cal.2d 526, 528.)  Thus, "[a] court may provisionally receive such evidence until it is 'in a position to determine whether in the light of all of the offered evidence, the item objected to will turn out to be admissible as tending to prove a meaning of which the language of the instrument is reasonably susceptible or inadmissible as tending to prove a meaning of which the language is not reasonably susceptible.' " (*Another Planet, supra,* 15 Cal.5th at p. 1144.)  Extrinsic evidence is admissible only to the extent it is relevant "to prove a meaning of which the language of the policy is reasonably susceptible." (*Id.* at pp. 1145–1146, citing *Pacific Gas*, at p. 40, fn. 7; accord, *Dore,* at p. 391.)

" '[I]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' [Citations.]  This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.' [Citation.]  Only if this rule does not resolve the ambiguity do we then resolve it against the insurer." (*Bank of the West, supra,* 2 Cal.4th at pp. 1264–1265; accord, *AIU, supra,* 51 Cal.3d at p. 822.)

With these principles in mind, we turn to the prior judicial construction doctrine.

9

## 2. *The Prior Judicial Construction Doctrine Does Not Preclude the Consideration of Extrinsic Evidence to Expose a Latent Ambiguity*

Our Supreme Court has long recognized "the principle that in construing insurance contracts the words expressing the intention of the parties should be given a meaning settled by judicial decision." (*Norris v. Pacific Indemnity Co.* (1952) 39 Cal.2d 420, 424.) Thus, if "a term in an insurance policy has been *judicially construed, it is not ambiguous* and the judicial construction of the term should be read into the policy unless the parties express a contrary intent." (*Bartlome v. State Farm Fire & Casualty Co.* (1989) 208 Cal.App.3d 1235, 1239 (*Bartlome*), italics added; accord, *Adamo v. Fire Ins. Exchange* (2013) 219 Cal.App.4th 1286, 1293–1294; see also *Delgado v. Interinsurance Exchange of Automobile Club of Southern California* (2009) 47 Cal.4th 302, 308 [the " 'common law construction of the term "accident" becomes part of the policy and precludes any assertion that the term is ambiguous,' " citing *Bartlome,* at p. 1239].) As our high court has put it, "[t]he term, having been judicially construed by this court, is not ambiguous." (*County of San Diego, supra,* 37 Cal.4th at p. 423 [rejecting out-of-state opinion construing the term " 'damages' " in a CGL policy to be ambiguous, citing *Bartlome,* at p. 1239].)

Montrose contends the trial court erroneously invoked this prior judicial construction doctrine to exclude extrinsic evidence that would have exposed a latent ambiguity in the term "sudden" as used in some of the QPEs. There is merit to this contention as a *general* proposition, even though we conclude (for reasons we will explain later) the trial court correctly excluded the evidence under the specific circumstances of this case. "Although

10

extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose.  The fact that the terms of an instrument appear clear to a judge"—or to an earlier appellate panel—"does not preclude the possibility that the parties chose the language of the instrument to express different terms."  (*Pacific Gas, supra,* 69 Cal.2d at p. 39.)  Thus, our statutory law directs that the "words of a contract are to be understood in their ordinary and popular sense . . . unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."  (Civ. Code, § 1644.)

The prior judicial construction doctrine is consistent with the foregoing principle.  The doctrine does not bar the admission of extrinsic evidence offered to reveal a latent ambiguity; rather, it recognizes a prior judicial construction "should be read into the policy *unless the parties express a contrary intent.*"  (*Bartlome, supra,* 208 Cal.App.3d at p. 1239, italics added.)  Because extrinsic evidence may show the parties intended a term to have a special meaning of which the policy language is yet reasonably susceptible—despite conflicting with an earlier judicial construction—the doctrine does not, perforce, preclude the admission of evidence offered to prove this "contrary intent." (*Ibid.*; see, e.g., *County of San Diego, supra,* 37 Cal.4th at pp. 423–425 [holding the term " 'damages' " "having been judicially construed by this court, is not ambiguous," but nevertheless considering extrinsic " 'course of dealing' " evidence to determine whether parties reasonably understood the term differently].)

11

The Insurers acknowledge the prior judicial construction doctrine allows the admission of extrinsic evidence to prove the parties' " 'contrary intent.' "  However, they argue Montrose's proffered evidence was nevertheless "superfluous" because it was "unrelated to any communications or documents exchanged between the actual parties to the policies at issue."  It is true that, in earlier cases framing the latent ambiguity rule, our Supreme Court has endorsed only the "preliminary consideration" of "credible evidence offered to prove the intention of *the parties* . . . so that the court can 'place itself in the same situation in which *the parties* found themselves at the time of contracting.' "  (*Pacific Gas, supra,* 69 Cal.2d at pp. 39–40, italics added; accord, *ACL, supra,* 17 Cal.App.4th at p. 1793 [explaining the rule of *Pacific Gas* "is *not* an endorsement of linguistic nihilism," as "the actual holding of the case is a fairly modest one:  courts should allow parol evidence to explain *special* meanings which the *individual parties to a contract* may have given certain words" (first and third italics added)].)[1]

More recently, however, our high court has appeared to sanction the consideration of "drafting history" and other "interpretative materials" as an aid in "construing standardized insurance policy language," even over the objection of insurers who have argued the material is "irrelevant."  (*Montrose*

---

[1]  Both Montrose and the trial court have incorrectly suggested *ACL* "[d]ismiss[ed]" the *Pacific Gas* holding "as 'linguistic nihilism.' "  That is the *opposite* of what *ACL* says about the holding in *Pacific Gas.*  (See *ACL, supra,* 17 Cal.App.4th at p. 1793 ["With all due respect to the critics of *Pacific Gas*, the case is not an endorsement of linguistic nihilism."].)

*Chem. Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 670–671 (*Montrose I*); see also *MacKinnon, supra,* 31 Cal.4th at p. 653 ["The history and purpose of the clause, while not determinative, may properly be used by courts as an aid to discern the meaning of disputed policy language."].) The rationale for considering this evidence appears to be that the "insurance industry" prepared these "standard form provisions," and so the industry's "interpretation and comment" should be "of considerable assistance" in determining the provisions' scope, given "the concomitant availability of interpretative literature." (*Maryland Casualty Co. v. Reeder* (1990) 221 Cal.App.3d 961, 968 (*Maryland Casualty*); see *Montrose I*, at p. 670, citing *Maryland Casualty*; but see *ACL, supra,* 17 Cal.App.4th at p. 1793, fn. 47 [implicitly criticizing *Maryland Casualty*; observing, "the interpretation of an insurance contract should not depend on access to industry publications"].)

The Insurers dispute whether cases like *Montrose I* and *MacKinnon* stand for the proposition that drafting history or other interpretative materials generated by the insurance industry should be considered when construing standard policy language. We need not resolve the disagreement here.[2] As

---

[2] Although the Supreme Court has endorsed the use of insurance industry drafting history as an aid to discern the meaning of disputed policy language, these cases do not appear intended to displace the established rule that courts must "generally interpret the coverage clauses of insurance policies broadly, protecting the *objectively reasonable expectations* of the insured" where an insurance policy has not been "actually negotiated and jointly drafted." (*AIU, supra,* 51 Cal.3d at pp. 822–823, italics added; see also *Another Planet, supra,* 15 Cal.5th at p. 1136 [" 'if the meaning a layperson would

13

we explain below, because the disputed policy language is not reasonably susceptible of Montrose's proposed interpretation, *no* extrinsic evidence *of any sort* is relevant or admissible to prove the meaning that Montrose seeks to establish. (See

ascribe to contract language is not ambiguous, we apply that meaning' "].) As the *AIU* court explained, this rule stems from "the fact that the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications." (*AIU,* at p. 822; see also *Bank of the West, supra,* 2 Cal.4th at p. 1265.) Thus, absent evidence that the insured was aware of industry drafting history before entering the policy, it seems that the established rule should govern to protect the insured's objectively reasonable expectations for coverage, and that drafting history would be irrelevant to establish a different meaning. The relevant cases are consistent with this established rule. (See, e.g., *MacKinnon, supra,* 31 Cal.4th at pp. 649, 652–653 [evidence regarding the "history and purpose" of absolute pollution exclusion was consistent with insured's reasonable expectations for coverage, while insurer's "broad interpretation of the pollution exclusion [would lead] to absurd results and ignore[ ] the familiar connotations of the words used in the exclusion"]; *Another Planet,* at p. 1147 [drafting history did "not support an understanding of direct physical damage or direct physical loss that differ[ed] from the plain meaning of those phrases"]; *Montrose I, supra,* 10 Cal.4th at p. 671 [considering drafting history to evaluate insurer's "public policy" argument]; see also *London Market Insurers v. Superior Court* (2007) 146 Cal.App.4th 648, 662 (*London Market Insurers*) [considering drafting history where it "bolstered" interpretation consistent with "plain meaning of the policy language"]; and see *Maryland Casualty, supra,* 221 Cal.App.3d at p. 968 [considering insurance industry commentary and publications, given "availability of interpretative literature"].)

14

*Another Planet, supra,* 15 Cal.5th at pp. 1145–1146 ["We have recognized that standardized insurance industry provisions and their accompanying interpretative materials may be useful in analyzing coverage issues. [Citation.] This general rule extends to standard form exclusions. But, *as with any extrinsic evidence,* such exclusions are *only relevant to the extent they tend to prove a meaning of which the language of the policy is reasonably susceptible.*" (Italics added.)].)

3.      ***The Trial Court Correctly Followed Binding Appellate Authorities Holding the Term "Sudden" Is Not Reasonably Susceptible of Montrose's Proposed Interpretation***

Montrose contends the trial court erred by excluding extrinsic evidence that would have revealed a latent ambiguity and established a reasonable construction of the term "sudden" in some of the QPEs at issue in this litigation. As we have discussed, the parties agreed to consolidate the different iterations of the QPEs into categorical exemplars, two of which contain the term "sudden"—the Domestic QPE and the London QPE. The Domestic QPE provides:

> "[It is agreed that the insurance does not apply to bodily injury or property damage] arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge,

15

dispersal, release or escape is *sudden and accidental*."[3]  (Italics added, fn. omitted.)

The London QPE provides:

"This Insurance does not cover any liability for: [¶] (1) Personal Injury or Bodily Injury or loss of, damage to, or loss of use of property directly or indirectly caused by seepage, pollution or contamination, provided always that this paragraph (1) shall not apply to liability for Personal Injury or Bodily Injury or loss of or physical damage to or destruction of tangible property, or loss of use of such property damaged or destroyed, where such seepage, pollution or contamination is caused by a *sudden, unintended and unexpected* happening during the period of this Insurance." (Italics added.)

As stated in its proposed findings for the Phase II-A trial, Montrose sought to introduce extrinsic evidence to demonstrate that the "plain language" of the foregoing QPEs "covers unintentional and unexpected pollution, *without regard to whether it is gradual or abrupt*."  (Italics added.)  The insured

---

[3]     We have reproduced the bracketed text as it appears in the parties' stipulation.  The stipulation explains that some of the Domestic QPEs have "minor variations in the prefatory language," but the parties had agreed that the "bracketed language accurately represents the Domestic Pollution Exclusion to be interpreted by the Court."

16

argued this evidence would have proved "the QPEs using the phrases 'sudden and accidental' [i.e., the Domestic QPE] or 'sudden, unintended or unexpected' [i.e., the London QPE] *do not require* that a pollution event be a 'boom'-type event or have *a specific temporal element*," and that "a reasonable policyholder would expect coverage for liability arising from *both gradual and non-gradual pollution* under an insurance policy with [such] a QPE." (Italics added.) In essence, Montrose maintained (as it does in this writ proceeding) that its proffered extrinsic evidence was relevant to prove the QPEs' exception for a "sudden" discharge, dispersal, release, or escape of pollutants includes a "gradual" discharge, dispersal, release, or escape of pollutants, so long as the pollution event is "unintentional and unexpected."

Our state courts of appeal have uniformly rejected the *exact* contention that Montrose makes here. In *Shell Oil*, the CGL policies contained a coverage exclusion for " 'damage arising out of the discharge, dispersal, release or escape' " of pollutants, with an exception stating either that coverage was reinstated "if the 'seepage, pollution or contamination is caused by a *sudden, unintended and unexpected happening* during the period of this Insurance' " (like the London QPE) or that the " 'exclusion does not apply if such discharge, dispersal, release or escape is *sudden and accidental*' " (like the Domestic QPE). (*Shell Oil, supra,* 12 Cal.App.4th at p. 753.) Like Montrose, the insureds argued the term " 'sudden' need not have a temporal connotation and reasonably [could] mean just 'unexpected' or . . . 'unintended.' " (*Id.* at p. 752.) The *Shell Oil* court rejected this proposed

17

interpretation, concluding "sudden"—as used in the relevant policy language—was not reasonably susceptible of a meaning that entailed *only* an unexpected or unintended event, without a temporal connotation. The appellate court explained:

> "We cannot *reasonably* call 'sudden' a process that occurs slowly and incrementally over a relatively long time, no matter how unexpected or unintended the process. A 'discharge, dispersal, release or escape' of pollutants that happens gradually and continuously for years is not 'sudden' in the ordinary and popular sense of the word. [Citation.] Thus, 'sudden' necessarily contains a temporal element in addition to its connotation of the unexpected." (*Id.* at p. 754, italics added.)[4]

---

[4] The *Shell Oil* court also concluded the insureds' proposed construction would violate "basic rules" of contract interpretation that discourage "redundancy" and require policy language to be construed "in its ordinary and popular sense unless the parties expressed a contrary intent." (*Shell Oil, supra,* 12 Cal.App.4th at p. 753, citing Civ. Code, §§ 1641, 1644; see *AIU, supra,* 51 Cal.3d at p. 827 [rejecting proposed construction that "would render the policy language at issue here redundant as well as inconsistent with an ordinary interpretation of the word"].) The appellate court explained: "If covered pollution has to be 'a sudden, unintended and unexpected happening,' then [to avoid redundancy] we must distinguish 'sudden' from 'unexpected' and 'unintended.' That distinction lies in the temporal connotation inherent in the ordinary meaning of 'sudden.' " (*Shell Oil,* at p. 753.) Similarly, "in the phrase, 'sudden and accidental,' 'accidental' conveys the sense of an unexpected and unintended

The court of appeal reached the same conclusion in *ACL*. There, the CGL policy contained a coverage exclusion for " 'damage arising out of the discharge, dispersal, release or escape' " of pollutants, with an exception stating the " 'exclusion does not apply if such discharge, dispersal, release or escape is *sudden and accidental*' " (like the Domestic QPE). (*ACL, supra,* 17 Cal.App.4th at p. 1778, italics added.) Again, the insured (this time with Montrose's support as amicus curiae) argued " 'sudden' (at least in some contexts) can mean 'unexpected' " and the word need "not necessarily convey a sense of abruptness." (*Id.* at pp. 1783–1784 & fn. 36.) The *ACL* court rejected this proposed interpretation. Even accepting, for the "sake of argument," that the phrase " 'sudden and accidental' is ambiguous," the appellate court reasoned this still would not justify stripping " 'sudden' " of its temporal connotation, as even ambiguous language must be "consistent with the *objectively reasonable* expectations of the insured."[5] (*Id.* at

---

event, while 'sudden' conveys the sense of an unexpected event that is abrupt or immediate in nature. 'Sudden and accidental' is not ambiguous [or redundant] if we give the words their full significance." (*Id.* at p. 755.)

[5] Like the *Shell Oil* court (see fn. 4, *ante*), the court in *ACL* also concluded "sudden," as used in the pollution exclusion, must have a temporal element, otherwise it would be rendered totally redundant in violation of established contract interpretation principles. (See *ACL, supra,* 17 Cal.App.4th at pp. 1786–1787 ["[D]efining terms in contracts to render them redundant is contrary to established principles of contract interpretation as laid down by our Supreme Court. . . . [¶] . . . It is not enough

19

p. 1788; see *Bank of the West, supra,* 2 Cal.4th at pp. 1264–1265.)
The *ACL* court explained:

> "[W]hatever 'sudden' means, it does not
> mean gradual.  The ordinary person would
> never think that something which happened
> gradually also happened suddenly.  The words
> are antonyms. . . .  Accordingly, no *objectively*
> reasonable policyholder would expect the
> word 'sudden' to allow for coverage for
> gradual pollution.  'Sudden' never means
> *both* 'unexpected and gradual.' "[6]  (*ACL,*
> at pp. 1788–1789, fns. omitted.)

---

that the meanings of two words, 'sudden' and 'accidental,' overlap.  Of course they overlap.  The world is full of accidents which happen suddenly.  The critical point, however, is that the interpretation ACL and Montrose Chemical Company proffer renders 'sudden' a mere subset of 'accidental,' making it totally redundant."]; see also *AIU, supra,* 51 Cal.3d at p. 827.)

[6]      The *ACL* court illustrated this point with an analogy from the "Peanuts" comic strip that remains apropos to the present case:  "The character Snoopy is sometimes shown typing out a story beginning, 'It was a dark and stormy night.  Suddenly a pirate ship appeared on the horizon. . . .'  In these two sentences, 'suddenly' can mean either unexpected (the pirate ship appeared without warning) or abrupt (one moment there was no ship, the next moment there was).  However, in no reasonable sense can Snoopy's sentence be twisted to mean 'Gradually a pirate ship appeared on the horizon.' "  (*ACL, supra,* 17 Cal.App.4th at p. 1789, fn. 42.)

20

Following *Shell Oil* and *ACL*, our state courts of appeal have uniformly concluded the term "sudden," as used in the relevant QPEs, must have a temporal element and is not reasonably susceptible of an interpretation that covers gradual pollution.  (See *A-H Plating, Inc. v. American National Fire Ins. Co.* (1997) 57 Cal.App.4th 427, 435–436 [" '[I]n the phrase, "sudden and accidental," . . . "sudden" conveys the sense of an unexpected event that is abrupt or immediate in nature.' "]; *FMC Corp. v. Plaisted & Companies* (1998) 61 Cal.App.4th 1132, 1146 (*FMC Corp.*) [" '[S]udden' means, at least, 'abrupt,' and thus does not apply to gradual releases of pollutants no matter how unexpected."], disapproved on other grounds in *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 201; *Standun, Inc. v. Fireman's Fund Ins. Co.* (1998) 62 Cal.App.4th 882, 889 (*Standun*) [" 'Sudden' has a temporal element and does not mean a gradual or continuous discharge."]; *Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1455 ["[T]he interpretation of 'sudden' must include a temporal component; otherwise, the word is rendered mere surplusage."].)

In excluding Montrose's proffered extrinsic evidence, the trial court correctly adhered to the established rule that decisions of the District Courts of Appeal are "binding upon" all superior courts of this state, and lower courts "must accept the law declared by courts of superior jurisdiction." (*Auto Equity, supra,* 57 Cal.2d at p. 455.)  Critically, *Shell Oil* and *ACL* (and all other appellate authorities that have followed) do not merely hold that "sudden" has an unambiguous meaning in the relevant QPEs.  As

21

discussed above, that prior judicial construction, *standing alone*, remains subject to countermand by credible extrinsic evidence offered to prove the parties intended the term to have a different "meaning of which the language of the instrument is reasonably susceptible." (*Pacific Gas, supra,* 69 Cal.2d at pp. 39–40 & fn. 7; see *Bartlome, supra,* 208 Cal.App.3d at p. 1239.)  What these authorities hold, however—and what made them unconditionally binding on the trial court with respect to its evidentiary ruling— is that "sudden" is *not reasonably susceptible* of the *exact* meaning that Montrose sought to prove by the admission of its proffered extrinsic evidence.

As our Supreme Court explained in *Pacific Gas*, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether *the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.*" (*Pacific Gas*, *supra*, 69 Cal.2d at p. 37, italics added.)  Because every District Court of Appeal to consider the issue has held—contrary to Montrose's proposed interpretation—that " 'sudden,' " as used in the QPEs, is not reasonably susceptible of a meaning that includes "*both* 'unexpected and *gradual*' " pollution (*ACL, supra,* 17 Cal.App.4th at p. 1789, second italics added), the trial court was bound to follow these controlling authorities and exclude Montrose's extrinsic evidence as *irrelevant.*  (*Pacific Gas,* at p. 37; *Auto Equity, supra,* 57 Cal.2d at p. 455.)

Montrose disagrees with this conclusion.  In its telling, "courts *must* provisionally receive any proffered extrinsic

evidence to determine whether the disputed language is 'reasonably susceptible' to the interpretation urged by a party." This is incorrect—particularly in the circumstances presented to the trial court here. To be sure, our Supreme Court has instructed that "rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties." (*Pacific Gas, supra,* 69 Cal.2d at pp. 39–40.) But this does not mean a court must blindly receive extrinsic evidence *before* considering whether disputed language is reasonably susceptible of the interpretation a party seeks to prove. On the contrary, as our high court explained in *Pacific Gas*, the determination of whether to receive extrinsic evidence provisionally is *situational*, and will only be necessary in circumstances where "the trial court *may not yet* be in a position to determine whether" the proffered extrinsic evidence "will turn out to be admissible as tending to prove a meaning of which the language of the instrument is reasonably susceptible or inadmissible as tending to prove a meaning of which the language is not reasonably susceptible." (*Id.* at pp. 39–40 & fn. 7, italics added; see also *American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1246 (*American Alternative*) [" '[I]n order to conclude that an ambiguity exists which will be construed against an insurer, it is necessary first to determine whether the coverage under the policy, which would result from such a construction, is consistent with the insured's *objectively reasonable expectations.*' "]; accord, *Bank of the West, supra,* 2 Cal.4th at p. 1265.)

"Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself." (*Curry v. Moody* (1995) 40 Cal.App.4th 1547, 1554, citing *Southern California Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 848.) While "[t]he fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms" (*Pacific Gas, supra,* 69 Cal.2d at p. 39), "evidence of the meaning the parties gave to the contract language is only relevant if the contract language itself is reasonably susceptible to that meaning." (*Curry,* at p. 1554, citing *Pacific Gas,* at p. 40.) "Thus, extrinsic evidence cannot be used to show that when the parties said 'Bunker Hill Monument' they meant 'the Old South Church' or that when they said 'pencils' they really meant 'car batteries.' " (*Curry,* at p. 1554; accord, *Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 14, 16–17 [holding instrument entitled "Assignment of Rents and Agreement Not to Sell or Encumber Real Property" could not "reasonably be construed as a mortgage and thus that extrinsic evidence, offered by plaintiff to prove the document a mortgage, is legally irrelevant and cannot support the judgment"].)

The Supreme Court recently reaffirmed this principle in *Another Planet*. As explained there, "[a] court *may* provisionally receive [extrinsic] evidence *until* it is 'in a position to determine whether in the light of all of the offered evidence, the item objected to will turn out to be admissible.' " (*Another Planet, supra,* 15 Cal.5th at p. 1144, italics added.) Critically, *Another Planet* also confirms this principle applies to the very sort of

24

extrinsic evidence that Montrose proffered in this case. "[A]s with any extrinsic evidence," standardized insurance exclusions "and their accompanying interpretive materials" are "only relevant to the extent they tend to prove a meaning of which the language of the policy is reasonably susceptible."[7] (*Id.* at pp. 1145–1146.)

Here, the trial court was plainly in a position to make an admissibility determination without provisionally receiving the challenged extrinsic evidence because (a) Montrose had stated exactly what meaning of "sudden" it claimed the extrinsic evidence would prove; and (b) controlling appellate authorities had uniformly concluded the relevant policy language was not reasonably susceptible of that exact meaning. Under these circumstances, it was "not [the lower court's] function to attempt to overrule decisions of a higher court." (*Auto Equity, supra,* 57 Cal.2d at p. 455.) The trial court correctly followed controlling

---

[7] This principle also aligns the latent ambiguity rule from *Pacific Gas* with our state's parol evidence rule. (See Code Civ. Proc., § 1856, subd. (a) [terms of a writing "may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement"]; *Dore, supra,* 39 Cal.4th at pp. 395–396 (conc. opn. of Baxter, J.) [identifying potential conflict between parol evidence rule and broad reading of *Pacific Gas*; observing majority opinion properly avoids conflict by applying latent ambiguity rule to allow admission of extrinsic evidence "only to prove a meaning the contract's language will reasonably accommodate"]; see also *ACL, supra,* 17 Cal.App.4th at p. 1791 [under parol evidence rule, "[w]hatever else extrinsic evidence may be used for, it may not be used to show that words in contracts mean the exact opposite of their ordinary meaning"].)

25

appellate precedent in ruling the proffered extrinsic evidence was "inadmissible" as Montrose offered it "to prove a meaning of which the language is not reasonably susceptible." (*Pacific Gas, supra,* 69 Cal.2d at pp. 39–40 & fn. 7.)

4. ***"Sudden" Cannot Reasonably Be Construed to Mean "Gradual"***

Unlike the trial court, we are not bound by the decisions of other appellate panels exercising equal jurisdiction. Nevertheless, we believe these past cases were correctly decided and we are not persuaded by Montrose's renewed efforts to overturn decades of appellate authority uniformly rejecting its proposed construction of the relevant QPEs. Montrose makes essentially three arguments for the reasonableness of construing the term "sudden" to embrace "gradual, unintended pollution." None is convincing.

Montrose's first argument is premised on the Travelers QPE—a third QPE category that, unlike the Domestic and London QPEs, does *not* contain the term "sudden." Rather, the Travelers QPE simply excludes coverage for injuries or damage arising out of a "discharge" of pollution that is "either expected or intended from the standpoint of any insured." In Montrose's telling, the Travelers QPE confirms that the Domestic and London QPEs' use of the term " 'sudden' " does not impose a temporal limitation on coverage because (a) the Travelers QPE "lacks any 'sudden' language," and (b) the Insurers purportedly admitted "all the QPEs are 'equivalent' in meaning." According to Montrose, "[b]y conceding the equivalency and interchangeability of all the various QPE versions, [the]

26

Insurers confirm that the term 'sudden' can reasonably mean 'unexpected.' " We agree with the Insurers—Montrose's argument is "misleading."

Contrary to Montrose's contention, the record shows the Insurers asserted the term "discharge"—not "sudden"—had an equivalent meaning in all QPEs. The argument addressed the parties' dispute over whether an expected or intended "*discharge*"—as opposed to *damage*—would trigger the coverage exclusion. It had nothing to do with whether the "sudden and accidental" exception applies to gradual pollution events. The Insurers stated the argument clearly in their trial brief:

> "The Travelers Pollution Exclusion . . .
> is slightly different from the 'sudden and
> accidental' language that appears in most of
> the underlying policies. Instead of excluding
> 'sudden and accidental' discharges, the
> Travelers Pollution Exclusion excludes
> coverage for damages resulting from any
> discharges that were 'expected or intended'
> from the standpoint of the insured—different
> language that achieves a similar result, *albeit*
> *without necessarily requiring any 'suddenness'*
> *component for coverage to apply*. . . . [¶] . . .
> Similar to the 'Sudden and Accidental' QPE
> language . . . , the plain and unambiguous
> language of the Travelers Pollution Exclusion
> focuses on the 'discharge' and whether the

27

*discharge* was expected or intended by the insured—not (as Montrose has contended) whether the ultimate *pollution* or damage to the environment was intended by the insured. Where the insured intentionally disposed of hazardous substances, the Travelers Pollution Exclusion applies, including where the resulting pollution is gradual and continuous and regardless of whether the insured intended to cause damage . . . ."[8]  (First italics added, fn. omitted.)

Having reviewed the whole record, including those passages selectively quoted by the insured, we are compelled to conclude Montrose has mischaracterized the Insurers' position.[9]

---

[8]  The Insurers' argument is consistent with our Supreme Court's interpretation of the relevant policy language.  (See *State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1020 (*Allstate*) ["We agree that in the 'sudden and accidental' exception, ' "[a]ccidental" means an unexpected or unintended *discharge*, not unexpected or unintended *damage*.' "].)  The trial court followed *Allstate* in holding the QPEs focus "on the discharge of a substance that is a 'pollutant,' . . . not the resulting damage."  Montrose does not challenge this ruling.

[9]  While there are several examples of this, one is sufficient to illustrate the point.  Purporting to accurately represent the Insurers' position, Montrose states in its briefs to this court that the Insurers "agree[d] that '[n]otwithstanding minor variations in language, each of the QPE variants should be interpreted equivalently.' "  The full passage from the Insurers' brief on judicial construction says something materially different from

28

The Insurers never argued that "sudden" did not have a temporal connotation or that it had the same meaning as "expected or intended" in the Travelers QPE.

Montrose's second argument is a familiar one. Relying on cases decided by out-of-state courts, the insured argues the word "sudden" can mean " 'unexpected' or 'unforeseen,' " and thus the relevant QPEs need not be construed to require an " 'abrupt' " pollution event to reinstate coverage. (See, e.g., *United Nuclear Corp. v. Allstate Ins. Co.* (N.M. 2012) 285 P.3d 644, 651, 656 [observing, "[d]ictionaries define 'sudden' as either synonymous with 'unexpected,' or as the temporal descriptor of a brief occurrence, or both," and concluding, "the meaning of the term 'sudden' as used in the Policies is ambiguous," requiring resolution of "such ambiguities against the insurer"]; *Hecla Min. Co. v. New Hampshire Ins. Co.* (Colo. 1991) 811 P.2d 1083, 1091–1092 [observing, "a number of recognized dictionaries differ on the meaning of the term 'sudden,' " and concluding "the term is ambiguous," requiring resolution "against the insurer to mean unexpected and unintended"]; *Cotter Corp. v. American Empire Surplus* (Colo. 2004) 90 P.3d 814, 821 [following *Hecla*]; *Public Service Co. v. Wallis and Companies* (Colo. 1999) 986 P.2d 924, 933 [holding "the term 'sudden' in the London pollution exclusion

what Montrose's selective quotation implies: "Montrose says: 'Notwithstanding minor variations in language, each of the QPE variants should be interpreted equivalently.' [Citation.] *Insurers agree that, to the extent a term has been judicially construed, it should be so construed by this Court for all policies.*" (Italics added.)

is ambiguous," and "must be construed against the insurer" to mean " 'happening or coming without warning or premonition' or 'unpremeditated, done without forethought,' " or " 'unforeseen' " and " 'not prepared for' "].) In view of these out-of-state authorities, Montrose insists the Domestic and London QPEs are "reasonably susceptible to a non-temporal reading."

Our state appellate courts have uniformly rejected this argument several times before, and Montrose offers no compelling ground to depart from their sound reasoning. Critically, while Montrose's out-of-state authorities have found the word "sudden" to be ambiguous in the abstract based on some dictionary definitions that do not necessarily convey a sense of abruptness, none of these cases directly confronts the specific claim that Montrose makes here—namely, that the "sudden" language in the relevant QPEs can be reasonably construed to mean "*gradual*, unintended pollution."[10]  (Italics added.)

---

[10]  As the *ACL* court observed, a "curious aspect of the leading cases interpreting 'sudden' as merely 'unexpected' or 'unexpected and unintended' " is that "they never really confront the problem that 'gradual' and 'sudden' are opposites." (*ACL, supra,* 17 Cal.App.4th at p. 1789, fn. 41; see, e.g., *Claussen v. Aetna Cas. & Sur. Co.* (Ga. 1989) 380 S.E.2d 686, 688 [citing different dictionary definitions to hold "sudden" is ambiguous without considering whether word is reasonably susceptible of meaning that includes "gradual"]; cf. *id.* at p. 690 (dis. opn. of Hunt, J.) [while " 'sudden' may have a number of meanings," its use within the context of the pollution exclusion certainly "does not encompass the gradual dumping of toxic wastes over a period of several years"].)  In contrast, courts from other jurisdictions that have confronted the issue have—like our state appellate courts—

As the *Shell Oil* court explained, while "one aspect of the
meaning of 'sudden' is 'unexpected,' " saying that " 'sudden'
means 'unexpected,' and nothing more, strips the word of a
significant facet of its ordinary meaning." (*Shell Oil, supra,* 12
Cal.App.4th at p. 754.) "Sudden events derive an 'unexpected'
quality both from being unforeseen and from having a
comparatively quick onset. We cannot *reasonably* call 'sudden'
a process that occurs slowly and incrementally over a relatively
long time, no matter how unexpected or unintended the process."
(*Ibid.*, italics added.) We agree with this reasoning—"whatever
'sudden' means, it does not mean gradual." (*ACL, supra,* 17

recognized that "sudden" and "gradual" are mutually exclusive
terms that logically cannot both be embraced by the "sudden
and accidental" exception. (See, e.g., *Lumbermens Mut. Cas. v.
Belleville Ind.* (Mass. 1990) 555 N.E.2d 568, 572 ["The issue is
whether the release was sudden. The alternative is that it was
gradual. . . . [¶] . . . If the word 'sudden' is to have any meaning
or value in the exception to the pollution exclusion clause, only
an abrupt discharge or release of pollutants falls within the
exception."]; *Hartford Acc. & Indem. Co. v. USF & G* (10th Cir.
1992) 962 F.2d 1484, 1489 [" 'sudden' cannot mean 'gradual,'
'routine' or 'continuous' "]; *U.S. Fidelity and Guar. v. Star Fire
Coals, Inc.* (6th Cir. 1988) 856 F.2d 31, 34 ["We do not believe
that it is possible to define 'sudden' without reference to a
temporal element that joins together conceptually the immediate
and the unexpected."]; *U.S. Fidelity & Guar. Co. v. Murray Ohio
Mfg. Co.* (M.D.Tenn. 1988) 693 F.Supp. 617, 622 ["Simply put,
an event that occurs over the course of six years logically cannot
be said to be 'sudden.' "].)

31

Cal.App.4th at p. 1788.) " 'Sudden' never means *both* 'unexpected and gradual.' "[11] (*Id.* at p. 1789.)

Moreover, although our high court has not directly considered whether "sudden" is susceptible of Montrose's proposed interpretation, the court has, in at least a few past cases, recognized the word conveys a meaning opposite to that of "gradual." (See, e.g., *Allstate, supra,* 45 Cal.4th at pp. 1029–1030 [discussed below]; *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 469, fn. 4 [contrasting "gradual natural accretion"

---

[11]   Even if we were to accept that "sudden" is ambiguous because some dictionaries define it as merely unexpected without a temporal connotation, this still would not resolve the dispute in favor of coverage.  Under our state law, even "[i]f policy language is ambiguous, an interpretation in favor of coverage is reasonable only if it is consistent with the *objectively reasonable expectations of the insured.*" (*London Market Insurers, supra,* 146 Cal.App.4th at p. 656, italics added; accord, *American Alternative, supra,* 135 Cal.App.4th at p. 1245.)  Our Supreme Court's directive on this point is clear:  " '[I]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' [Citations.] This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the *objectively reasonable expectations* of the insured.' [Citation.] *Only if this rule does not resolve the ambiguity do we then resolve it against the insurer.*" (*Bank of the West, supra,* 2 Cal.4th at pp. 1264–1265, italics added.)  Because an objectively reasonable policyholder would not expect "sudden" to mean gradual, Montrose would not be entitled to coverage for gradual pollution under the relevant QPEs, even if we were to find the language somehow ambiguous.

with "sudden avulsion" (italics omitted)]; *Geddes & Smith, Inc. v. Saint Paul-Mercury Indem. Co.* (1959) 51 Cal.2d 558, 564 ["[A]lthough it may have taken many months for all of the doors to fail and fall apart, it is clear that each door, when it failed, failed suddenly. At one moment it was a usable door, at the next it was not."]; see also *Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674, 698 [quoting journal article contrasting " 'sudden damage such as fire and windstorm' " with " 'gradual damage such as settlement' "].)

Most recently, in *Allstate*, our Supreme Court considered whether recovery was barred under the QPE at issue where the insured admitted it could not differentiate damage caused by discrete "sudden and accidental releases" from damage "caused by the gradual leakage of wastes." (*Allstate, supra,* 45 Cal.4th at p. 1028.)[12] Like the policies with a Domestic QPE in our case,

---

[12] Montrose contends our Supreme Court in *Allstate*, as well as earlier in *MacKinnon*, "expressly found the [QPE] is 'ambiguous.' " This, again, is a misleading argument. In *MacKinnon*, the court held an apartment building owner's liability for spraying the building with insecticides was not excluded from coverage under a pollution exclusion that lacked the sudden and accidental exception. (*MacKinnon, supra,* 31 Cal.4th at p. 639; see *Allstate, supra,* 45 Cal.4th at p. 1020.) In so holding, the *MacKinnon* court noted that the terms " 'release' " and " 'escape' " in a pollution exclusion "connote some sort of freedom from containment" (*MacKinnon,* at p. 651); "the word 'dispersal,' when in conjunction with 'pollutant,' is commonly used to describe the spreading of pollution widely enough to cause its dissipation and dilution" (*ibid.*); and in the pesticide context " 'discharge' " was most commonly used "to describe pesticide runoff behaving as a traditional environmental

the policies at issue in *Allstate* defined an " 'Occurrence' as 'an accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in . . . Property Damage neither expected nor intended from the standpoint of the Insured,' " and excluded from coverage " 'Property Damage arising out of' pollution to land or air, unless the discharge of pollutants was sudden and accidental." (*Id.* at p. 1029.)  Under these provisions, our high court explained, "liability for property damage caused by an accident was covered, *while that caused by gradual or nonaccidental release of pollutants was excluded.*" (*Id.* at pp. 1029–1030, italics added.) "What, then," the *Allstate* court asked, "of property damage caused by a set of pollutant discharges, some sudden and accidental, and some gradual or nonaccidental?"  (*Id.* at p. 1030.) It concluded the insured would still be entitled to coverage to the extent the sudden and accidental discharges were substantial factors in causing the overall harm, even if the gradual "subsurface leakage from the site, *an excluded cause of property damage*, also contributed to the contamination."  (*Id.*

---

pollutant" (*id.* at p. 652).  As the court later recounted in *Allstate*, because of the "tension between the potentially broad literal meanings of *these terms*"—i.e., " 'release' and 'escape,' " " ' "dispersal," when in conjunction with "pollutant," ' " and " 'discharge' "—"and their connotations in common usage, the pollution exclusion as phrased here and in *MacKinnon* is ambiguous as to its exact scope of application."  (*Allstate, supra,* 45 Cal.4th at p. 1020, italics added.)  There is no fair reading of these cases that could lead one genuinely to believe—as Montrose implicitly argues—that our Supreme Court held the term "*sudden*" is ambiguous in the relevant QPEs.

at pp. 1031–1032, italics added; see also *id*. at p. 1032 ["liability coverage exists 'whenever an insured risk constitutes a proximate cause of an accident, even if an excluded risk is a concurrent proximate cause' "].)

To be sure, *Allstate* arose in a different context that did not require the Supreme Court to confront directly whether— as Montrose claims—the "sudden" language in the Domestic and London QPEs covers "gradual, unintended pollution." Nevertheless, we agree with the Insurers that the *Allstate* court's discussion of covered and excluded discharges would have been unnecessary if the term "sudden" could encompass "gradual" events. And, in any event, while *Allstate* may not be directly controlling on the issue presented in this case, it does illustrate what our state appellate courts have uniformly recognized when confronting this issue—that gradual is the opposite of sudden and, therefore, the "sudden" language in the relevant QPEs "[can]not mean a gradual or continuous discharge." (*Standun, supra,* 62 Cal.App.4th at p. 889; accord, *ACL, supra,* 17 Cal.App.4th at p. 1789; *FMC Corp., supra,* 61 Cal.App.4th at p. 1146.)

Finally, Montrose contends reading the policies "as a whole" confirms "coverage was intended for gradual pollution events." But Montrose's argument is not actually based on policy language. Instead, Montrose premises its contention on our Supreme Court's discussion in *MacKinnon* about the historical background of the pollution exclusion and, specifically, the change from "accident"- to "occurrence"-based coverage in standard CGL policies that apparently precipitated the

35

exclusion's adoption.  While the argument appears to be a thinly veiled attempt to smuggle in extrinsic evidence that would be relevant only if the term "sudden" were reasonably susceptible of a meaning that included "gradual," we will nevertheless address the argument on its merits to explain why—in our view—it is fundamentally flawed.

As we noted earlier (see fn. 12, *ante*), *MacKinnon* did *not* interpret the "sudden" language in the relevant QPEs— the " 'absolute pollution exclusion' " at issue in *MacKinnon* lacks this exception.  (*MacKinnon, supra,* 31 Cal.4th at pp. 639, 644; see *Allstate, supra,* 45 Cal.4th at p. 1020.)  Rather, the issue in *MacKinnon* was whether the pollution exclusion's reference to "injuries caused by the 'discharge, dispersal, release or escape of pollutants' " was sufficiently clear to "exclude ordinary acts of negligence involving toxic chemicals such as pesticides." (*MacKinnon,* at p. 639.)  In the context of interpreting this policy language, the *MacKinnon* court reviewed the "historical background" of the exclusion, quoting "extensive[ly]" from the Illinois Supreme Court's "comprehensive review of this history" in *American States Ins. Co. v. Koloms* (Ill. 1997) 687 N.E.2d 72 (*Koloms*).  (*MacKinnon,* at p. 643.)  The relevant discussion from *Koloms*, as quoted in *MacKinnon*, is this:

> " 'Prior to 1966, the standard-form CGL policy provided coverage for bodily injury or property damage caused by an "accident."  [Citations.] The term "accident," however, was not defined in the policy.  As a result, courts throughout the country were called upon to define the

term, which they often interpreted in a way as to encompass pollution-related injuries. In response, the insurance industry revised the CGL policy in 1966 and changed the former "accident"-based policy to an "occurrence"-based policy. The new policy specifically defined an "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury and property damage that was neither expected nor intended from the standpoint of the insured." [Citation.] Despite these changes, courts continued to construe the policy to cover damages resulting from long-term, gradual exposure to environmental pollution. . . .' " (*MacKinnon*, at p. 643, quoting *Koloms*, at pp. 79–80.)

Partially quoting the final line of this passage from *MacKinnon*, Montrose argues these historical "revisions underscored that the occurrence-based standard form CGL policy 'cover[ed] damages resulting from long-term, gradual exposure to environmental pollution.' " That is plainly *not* what the *Koloms* or the *MacKinnon* courts meant to convey in reciting this history. On the contrary, as the full passage makes clear, the change from accident-based to occurrence-based coverage was relevant to the insurance industry's later adoption of the pollution exclusion because (a) the industry had changed the accident-based policy to an occurrence-based policy " '[i]n response' " to the fact that

courts " 'often interpreted' " the undefined term "accident"
" 'in a way as to encompass *pollution-related injuries,*' " and
(b) " '*[d]espite these changes*' "—i.e., the change to occurrence-
based policies—" '*courts continued* to construe the policy to
cover damages resulting from long-term, gradual exposure
to *environmental pollution,*' " finally prompting the industry to
formulate the pollution exclusion. (*MacKinnon, supra,* 31 Cal.4th
at p. 643, quoting *Koloms, supra,* 687 N.E.2d at pp. 79–80, italics
added.) Nothing about this history supports the notion that the
"sudden and accidental" exception was meant to embrace gradual
pollution. Indeed, the *Koloms* court found this history proved
the " 'pollution exclusion *has been*, and should continue to be,
the appropriate means of avoiding " 'the yawning extent of
potential liability arising from the *gradual or repeated discharge*
of hazardous substances into the environment.' " ' " (*MacKinnon,*
at p. 645, quoting *Koloms*, at p. 81, italics added, italics omitted.)
That is the opposite of what Montrose suggests this historical
evidence proves.

In any event, this historical evidence—"as with any
extrinsic evidence"—is "only relevant to the extent [it] tend[s]
to prove a meaning of which the language of the policy is
reasonably susceptible." (*Another Planet, supra,* 15 Cal.5th
at pp. 1145–1146.) That was the case in *MacKinnon*, as the
phrase " 'discharge, dispersal, release or escape of pollutants' "
is reasonably susceptible of a meaning that does not necessarily
include the normal application of pesticides around an apartment
building. (*MacKinnon, supra,* 31 Cal.4th at pp. 639, 650–654;
see, e.g., *id.* at p. 653 [" 'The drafters' utilization of environmental

law terms of art ("discharge," "dispersal," . . . "release," or "escape" of pollutants) reflects the exclusion's historical objective —avoidance of liability for *environmental catastrophes* related to intentional *industrial pollution*.' " (Italics added.)] It is not the case here. Whatever shades of meaning the word "sudden" may have, it does not include events that happen gradually over time. "Gradual is the opposite of sudden." (*ACL, supra,* 17 Cal.App.4th at p. 1777.) The trial court properly excluded the evidence.

## DISPOSITION

The writ is denied. Real Parties in Interest are entitled to their costs.


**CERTIFIED FOR PUBLICATION**



EGERTON, J.

We concur:



EDMON, P. J.



ADAMS, J.

39